Whaley, Chief Justice,
delivered the opinion of the court:
On January 12, 1938, the plaintiff entered into a contract with the War Department for a change in the Augusta Levee, near Augusta, Georgia. The work included enlargement of a portion of the levee both to the landside and to the riverside, a false berm on the landside, certain road crossings and a steel sheet pile retaining wall.
The specific work involved in suit is the handling of earth. There is no controversy over the retaining wall.
Earth or dirt for the enlargement was to be obtained from two sources. The existing levee was to contribute its designated share; the remainder was to be obtained from borrow pits in South Carolina. The material for the false berm was to come from landside borrow pits to the extent shown on the drawings, the remainder to come from the borrow pits in South Carolina.
The specifications and drawings gave engineering details. Dirt from the borrow pits in South Carolina is designated as “haul”; that from a location close enough to the new work to be cast thereon by dragline and bucket is known as “cast.”
The specifications estimated the yardage of enlargement, false berm, and road crossings to be 216,000 cubic yards, which was approximate only, and might be increased or diminished by not more than 20 percent.
The contract drawings indicated also a total yardage of 216,000 cubic yards, of which approximately 114,000 was to be haul and 102,000 was cast, a ratio of 52.78 (haul) to 47.22 (cast).
These estimated quantities were what is known as “net” yardages. The plaintiff had actually to haul and cast dirt of greater volume to take care of shrinkage. This factor of shrinkage was stated in percentages which were affected by the manner of handling the dirt, such as by heavy or light tractor, by dragline and the nature of the dirt. The embankment had to be constructed up to a so-called gross grade, to *27 take care of subsequent shrinkage, and traction of equipment over the levee as it mounted higher might necessitate more dirt in order to achieve the required gross grade. Shrinkage factors were specified, and the plaintiff and the defendant could make their calculations accordingly.
The plan of work was to haul dirt from the South Carolina pits, deposit it on the levee up to a certain point or elevation, and then bring the levee up to gross grade by casting thereon dirt from certain nearby sections of the old levee or borrow pits.
Casting was cheaper than hauling, and, in order to use all the dirt permitted to be taken from the old levee, this called for some nice calculation of the amount that should first be hauled. If the hauling was underestimated, hauling would have to be resumed after casting, because only certain amounts could be taken from the old levee, and the trucks hauling on the second operation from the South Carolina pits would have a higher ascent to climb, manifestly increasing the cost of operations. It was important, for reasons of economy, to use the distant borrow pits for low-level embankment.
With this situation in view the plaintiff made its bid of 22 cents per cubic yard, regardless of whether the material was haul or cast.
The 22 cents per cubic yard is explained as follows: The plaintiff estimated the cost of handling 114,000 cubic yards of haul at 24 cents per cubic yard, and the cost of handling 102,000 cubic yards of cast at a figure which amounted to 6.7 cents per cubic yard. The total cost, thus calculated, would be $34,194.00. The bid price was $47,520.00, and the difference of $13,326.00 was the contractor’s anticipated profit.
It will thus be seen that if the estimated cost per cubic yard for each class and the bid price per cubic yard for both classes be taken as constants, a variation in the ratio between haul and cast would upset the anticipated profit.
And the burden of plaintiff’s complaint, as we understand it, is that the ratio of 52.78 (haul) to 47.22 (cast), deduced from the contract drawings, so greatly varied from conditions as they developed in the actual work, as to constitute a misrepresentation amounting to breach of contract. This, in substance, is the conclusion of plaintiff’s brief.
*28 But there are other questions to be disposed of. Plaintiff contends that the defendant’s calculation of quantities for pay purposes is inaccurate and unreliable, and the defendant, denying plaintiff’s contention, maintains that the plaintiff’s proposed method of arriving at pay quantities embraces certain false premises and is not trustworthy.
The burden of proof that must be borne by the plaintiff goes beyond that of showing that the defendant’s basis of settlement is erroneous. Without proof of a more exact settlement there would be no foundation for a money judgment such as this court is empowered to award.
The contract did not provide the specific method of measuring the earthwork, but the defendant, in making its concluding settlement on the contract, applied cross-sections made from surveys. Such surveys are of course made before and after the work has been done, are compared with each other, and the necessary engineering calculations made. Surveys are not always accurate, but with a reasonable degree of accuracy the results are deemed sufficient for pay purposes. We understand that plaintiff’s position is not that the cross-section method is of itself unreasonably inaccurate, but that in this case the preconstruction cross-sections were so grossly inaccurate as to form no reasonable basis for payment; that, the final survey made, the final cross-sections taken could not in fairness be superimposed upon the original cross-sections, the original cross-sections being so grossly inaccurate.
Early in the work the plaintiff found that the Government was paying it less than it was currently expending on the work. Daily estimates of the work done did not agree with the estimates upon which payments were being made, although this discrepancy was not conclusive of inaccuracy, for the reason, in part, that the daily estimates of earthwork were of gross yardage, while the estimates for pay purposes were of net yardage, and the difference between gross and net was determined by contract percentages based on the nature of the particular operation and the nature of the material.
The plaintiff, being skeptical, tried another method of measuring quantities. It began to count the truck-loads of earth hauled. This method of measurement did not of course *29 apply to dragline and bucket, but the hauling was apparently what the plaintiff was more concerned about.
The capacity of the trucks varied, and the loading was not uniform. Since payments were being made on net yardage the difficulty was presented of ascertaining an appropriate shrinkage factor to be applied. If a truck was carrying three cubic yards, how many net cubic yards did that represent in place in the levee enlargement?
In order to ascertain the average load per truck, two given factors are needed. One is the number of trucks, the other is the total load of all of them. But the total load is here not a given factor, it is a result which is to be ascertained. We conclude that plaintiff’s estimate of four cubic yards gross as the average is without proper foundation in the evidence. A uniform percent for shrinkage in a truck-load, and a reliable average for the gross yardage of a truck-load, are highly indefinite, and the record, as we find it, fails to show that the truck-load method of measurement, as here conducted, followed good engineering practice.
Accepting then the Government’s survey of the work, as we must do, the question arises whether a change in the ratio between 52.78 (haul) and 47.22 (cast) was so great as to constitute a misrepresentation amounting to breach, or at least sufficient to require of the contracting officer an equitable adjustment as for a change in contract terms.
Section No. 7 of the specifications provides that payments will be made monthly on estimates of yardage satisfactorily placed, and that the estimates would be based upon net yardage.
Obviously, measurement in place, in levee or berm, of the net yardage, did not mean that the contractor was to be paid for the amount hauled or handled. If he hauled or cast more material than necessary he could not, under the terms of the contract, be paid for it. By the design of the levee, if adhered to, the contractor could theoretically therefore estimate, before he did the work, what his final compensation would be.
The defendant could, however, increase plaintiff’s cost by preventing it from casting material agreed to be available for casting, and requiring such material to be hauled. The oper *30 ation of hauling, as has been pointed out, was more than that of casting.
On or about April 5,1938, the defendant, by Change Order No. 1, increased the contract quantity of earthwork by an approximate 3,300 cubic yards. This appears to have been haul. (See Finding No. 28.) This made 117,300 cubic yards of haul and 102,000 of cast for the whole of Item No. 1, a new total of 219,300 cubic yards.
It was found that, after the advertising for bids on the contract work, a railroad track on top of a portion of the existing levee (by the contract agreed to be available for casting) had been extended 300 feet. This extension required the plaintiff to haul 2,635 cubic yards which otherwise it could have cast. The defendant issued Change Order No. 2, by way of equitable adjustment, paying 26% cents more per cubic yard for the 2,635 cubic yards, representing the difference between cost of haul and cost of cast.
This had the effect of further changing the original estimate of 114,000 cubic yards of haul to 119,935 cubic yards of haul, and 102,000 cubic yards of cast to 99,365 cubic yards of cast, a total of 219,300 cubic yards for all of Item No. 1.
The final contract ratio thus was changed from 52.78 (haul) and 47.22 (cast) to 54.69 percent haul and 45.31 percent cast.
The work involved is designated in the specifications as Item No. 1, and is described therein as a unit between stations 165+00 and 332+86, with an approximate quantity of 216,000 cubic yards.
Section No. 11 of the specifications reads:
11. Yardage. — The yardage given for each item is approximate only. Between the station limits set forth in paragraph 34 the yardage may be increased or diminished by not more than 20 percent. This variation will apply to each item individually.
The plaintiff placed 13,180 cubic yards above the specified grade. This the defendant refused to pay for. Excluding the 13,180 cubic yards, therefore, the total pay amount actually placed by the plaintiff was 211,094 cubic yards. The ratio of 54.69 (haul) and 45.31 (cast) apportions this total, 115,447 cubic yards of haul, and 95,647 cubic yards of cast.
*31 Of the total of 211,094 cubic yards placed according to specifications, as amended, the. plaintiff hauled 134,764.8 cubic yards, and cast 76,329.2 cubic yards. This was a ratio of 63.84 (haul) to 36.16 (cast).
The amended estimated contract haul being 119,935 cubic yards, and the actual haul 134,764.8 cubic yards, there was an increase in haul of 14,829.8 cubic yards, which is some 12.36 percent of 119,935 cubic yards.
The variance allowed by Section No. 11 of the specifications was 20 percent between station limits. It did not give a certain percentage of variance for haul and another percentage for cast, nor did it otherwise segregate the two. But haul is used here for illustration, being the more expensive of the operations, and the variance is considerably less than 20 percent.
To recognize a remunerable difference between cast and haul would be to treat the contract as though it provided for separate prices for cast and haul. This it did not do. The plaintiff is not entitled to recover on this phase of the case.
The excess haul, 14,829.8 cubic yards as here computed, plaintiff apparently contends was due, in part at least, to erroneous setting of construction stakes by defendant’s inspector. But this voluntary action on the part of the inspector did not relieve plaintiff of the duty of complying with the contract plans. During the first half of the construction work the plaintiff had no engineer of its own on the project and it must accept the result of its own failure to have personnel on the job of the necessary training and experience to fulfill what was its own obligation under the contract. Section No. 17 of the specifications provided that notes would be furnished to the contractor giving in detail all necessary information as to gradtes, cross-sections, and dimensions, the contractor to provide, set and maintain such construction stakes as were necessary and suitable for the proper conduct of the work.
Whatever excessive placement there was in the work was of course not payable.
Section No. 7 of the specifications relating to payments proyided: “Estimates will be based upon net yardage except as otherwise herein specifically provided.” There was no *32 provision for payment of yardage placed over that necessary to make the required net yardage.
With reference to the landside false berm between stations 267 and 332, it was estimated in the contract that 13,000 cubic yards required between stations 317 and 332 could be cast from the borrow pit. This casting in fact could not be done. The material had to be hauled instead and actually amounted to 13,033.4 cubic yards, which was very close to the estimate. The excess cost to the plaintiff for this specific operation was $3,453.85 at a differential of 26% cents per cubic yard.
The cost of casting was 8 cents per cubic yard, and that of hauling 34% cents per cubic yard. It was therefore of some importance to the plaintiff that material be cast, where that was possible.
In Change Order No. 2 the defendant was responsible for the changed condition whereby the plaintiff was compelled to haul rather than cast.
There is no indication that, as to quality of construction, casting was better than hauling, or vice versa. This is evident from the fact that, although casting was contemplated for topping out, the plaintiff without objection used hauled material. Whether casting or hauling was to be employed was a matter of physical situation, the distance between the embankment and the source of supply. At the time of bidding and contracting the plaintiff based its tendered price on the plans, drawings, specifications, on the contract documents as a whole. There is no assertion that it was not fully apprised also as to the physical situation as it was presented to the eye in the field. It knew also that if distance precluded casting in any spot, hauling would have to be resorted to. There is here no breach of contract. See in this connection Ross Engineering Co. v. United States, 103 C. Cls. 185, certiorari denied October 8, 1945. [326 U. S. 735.]
The plaintiff’s unfortunate situation at the conclusion of the contract work is doubtless in part explained by the fact that whereas its bid of 22 cents per cubic yard was constructed of 24 cents for haul and 6.7 cents for cast, its actual cost turned out to be 34% cents for haul, and 8 cents for cast, an *33 underestimate on plaintiff’s part for which the Government was in no way responsible.
The plaintiff is not entitled to recover on its claim viewed from any angle, and the petition is dismissed. It is so ordered.
Jones, Judge; Whitaker, Judge; and Littleton, Judge, concur.
Madden, Judge, took no part in the decision of this case.