JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.

### DUBOIS CONST. CORP. v. UNITED STATES.

#### No. 47561.

United States Court of Claims.

Decided July 9, 1951.

---

1. See findings 4, 5, 6, 7, and 19 for the facts constituting the bases of this computation.

ington, North Carolina, where the defendant's contractor, The Tyler Construction Company, was doing the preliminary grading which was required before paving. The claim is to recover damages of $121,-269.16, allegedly suffered by the plaintiff due to the defendant's breach of the contract at its inception and to recover $6,000 liquidated damages assessed against the plaintiff upon completion and acceptance of its contract, an aggregate of $127,269.16 being claimed.

The defendant has interposed a counterclaim to recover its costs of $8,043.47 in rejointing the concrete where the plaintiff had not done the work in accordance with the specifications. This sum was spent by the defendant after the job had been accepted and paid for.

The essential facts can be briefly stated. The Civil Aeronautics Administration in June, 1943, had advertised for bids for construction of the airport. Under terms of the proposal, grading was to be performed under Schedule I and paving under Schedule II. The Tyler Construction Company was the low bidder on both schedules and got the awards. However, the defendant changed the type of pavement and readvertised the paving scheduled. In August 1943, prior to the execution of either the final grading or the paving contract, Tyler was permitted to do some preliminary grading. The Tyler contract was executed on September 1, 1943, and Tyler received its notice to proceed effective as of September 3, 1943. The plaintiff's bid on the readvertised paving contract was submitted on September 1, 1943. The plaintiff was the low bidder and was sent a contract for execution on September 13, 1943. The defendant's letter of transmittal contained a statement that notice to proceed would be issued upon acceptance of the contract. The contract, however, executed by both parties on September 27, 1943, provided that, "It is intended that notice to proceed to plaintiff will be issued not more than 60 calendar days after notice to proceed on Schedule I."

After receiving notice to proceed, Tyler speeded up its operations, and by the first week of November 1943, had one runway ready for paving. Notice to proceed was

Homer E. Peters, Albany, N. Y., for plaintiff. McClung, Peters and Simon, Albany, N. Y., were on the briefs.

Carl Eardley, Washington, D. C., with whom was Acting Asst. Atty. Gen. Newell A. Clapp, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is a claim which arises out of a contract entered into on September 27, 1943, by the defendant, through the Civil Aeronautics Administration, with the plaintiff for paving work at a new airport at Wash-

thereupon issued to plaintiff effective November 8, 1943, and both contractors proceeded with their respective work until December 15, 1943, at which time the defendant stopped all operations due to the severe winter weather. Notice to resume operations was not issued until March 21, 1944. However, the plaintiff, in January, was permitted to do considerable paving in order to enable it to dispose of several cars of cement which it had on hand at the time the stop order was issued.

In the fall of 1943, the Government invited Tyler to bid upon a supplemental contract to extend two of the runways an additional 1,000 feet. On January 3, 1944, Tyler executed a contract to do the grading work on such extensions, it being stipulated that Tyler would receive a time extension of 60 days. In February, 1944, the plaintiff was requested to bid on the paving work for the extensions and submitted a bid requesting additional compensation and an extension of 60 calendar days. Following negotiations the plaintiff agreed to a time extension of 50 days, and on April 18, 1944, a supplemental contract was executed, whereby the plaintiff agreed to pave the extensions, the plaintiff to receive "a fifty-day extension in time."

The plaintiff proceeded with the paving operations until June 9, 1944, at which time an inspection was made to determine whether or not the contract work was ready for acceptance. The inspection party discovered that the joints were not correctly constructed and directed the plaintiff to comply with contract specifications. The plaintiff continued working until June 14, 1944, at which time the defendant's project engineer, notified the Civil Aeronautics Administration regional office that the plaintiff had satisfactorily completed the work, and thereafter the plaintiff was paid the full contract price. In reality the corrective work had not been done. Further inspections revealed the extensive non-compliances, and in the spring of 1945, the defendant did the corrective work necessary to make the joint construction comply with contract specifications.

■ We address ourselves first to the plaintiff's contention that the defendant

by false and fraudulent representations breached the contract at its inception. These alleged fraudulent misrepresentations consist of (a) the defendant's permission to the grading contractor, Tyler, to start operations in August, 1943, prior to execution of the Tyler contract or notice to proceed, and (b) the defendant's letter of September 13, 1943, stating that a notice to the plaintiff to proceed would be issued upon acceptance of the contract by the plaintiff. The plaintiff relies upon the principle laid down in United States v. Gibbons, 109 U.S. 200, 3 S.Ct. 117, 27 L.Ed. 906, wherein on a dissimilar state of facts, the Supreme Court said, in effect, that the conditions at the site of work which bidders are required or invited to inspect before bidding may, under certain circumstances, constitute a representation by the Government of an essential fact inducing the bid and fixing rights under the contract. The plaintiff says that this principle has application in this case to the physical representation afforded bidders who observed Tyler at work commencing August 1, that his time for delivery of one runway had thereby become fixed and that the plaintiff could start work not later than October 1 and finish before cold weather. With the principle we have no quarrel. But, it does not fit the facts of this case as the plaintiff alleges.

Defendant was under no legal obligation to notify all bidders that a notice to proceed had not been issued to Tyler. Further, by permitting Tyler to proceed on this job classified as essential to the war effort in which speed was thus of the essence, the defendant thereby made no implied promise to others that a notice to proceed had been issued to Tyler. There is an unfortunate void in the evidence as to whether or not the plaintiff was aware that a formal proceed order had not been issued to the grading contractor. The plaintiff's estimator who visited the site and contacted Tyler's superintendent was deceased at the time of the trial and there was no evidence as to what information the plaintiff did or did not have on this issue at the time it submitted its bid. We do know, however, that the contract provided that bidders should inspect the site of the work to acquaint

themselves thoroughly with the local conditions. It is hard to believe that no inquiry would have been made by the plaintiff's representative who did visit the site. In any event, we have found that had such an inquiry been made, or if it was made, it is reasonable to conclude that the plaintiff was or would have been advised of the true and technical facts of the situation. In the case of Southern Surety Co. v. United States, 75 Ct.Cl. 47, 68, the Court's language is pertinent to the instant problem: "* * * There is no showing that the Government refused to furnish information nor that incorrect information was furnished. There was no duty resting upon the defendant voluntarily to come forward and supply the plaintiff with all the existing facts for its guidance. The contract and the specifications expressed the rights of the parties. * * *"

The plaintiff's contention falls for lack of proof so far as it is alleged that defendant's actions in permitting Tyler to proceed in advance of a formal contract and proceed order falsely and fraudulently misled the plaintiff.

■■ Defendant represented that a notice to proceed would be issued upon acceptance of the contract by the plaintiff when, in fact, the contract was accepted on September 27, 1943, and the notice to proceed did not issue until November 8, 1943. The plaintiff insists that by relying upon this representation, in making its bid, it concluded that it would be able to finish paving work in the fall of 1943 and that by reason of the defendant's breach the plaintiff's operations carried over into the spring of 1944 to the plaintiff's damage. The short answer to this contention is that the plaintiff's bid was prepared and submitted on September 1, 1943, so it could not possibly have been prepared in reliance upon the defendant's representation of September 13, 1943. Moreover the record shows that the plaintiff did, in fact, anticipate unfavorable weather conditions and we have so said in our finding 13. The rule is that where the aggrieved party knows the actual state of affairs, representations contrary to fact cannot be construed as warranties. Ross Engineering Co., Inc.

v. United States, 103 Ct.Cl. 185, 198, certiorari denied 326 U.S. 735, 66 S.Ct. 45, 90 L. Ed. 438; Somers Construction Co. v. United States, 106 Ct.Cl. 1; Callahan Construction Co. v. United States, 47 Ct.Cl. 177; Kremer v. United States, 88 F.Supp. 740, 116 Ct.Cl. 358. Since there was no causal connection between the alleged misrepresentation and the damage there, of course, can be no recovery for it. This is especially so because the plaintiff elected to remain mute concerning the alleged misrepresentation during the contract operations. Had he been damaged thereby we think that he would have said so in no uncertain terms. In Ross Engineering Co., Inc. v. United States, supra, this court said, "We hardly think it possible that one who had been seriously misled would have failed to utter even a mild protest."

■ Plaintiff performed the contract and accepted its benefits after gaining full knowledge of the so-called misrepresentation in this case, and under such circumstances must be held to have waived its right to claim damages for such misrepresentation.

■■ There was a greater potentiality of confusion in the language of the contract prepared by the defendant than actually materialized from the letter of transmittal upon which the plaintiff relies. Apparently the defendant, through the CAA, had four different ideas about when the notice to proceed would issue. The letter of enclosure accompanying the invitation of September 13, 1943, said that notice to proceed would issue when the contract was accepted, which would have been September 27, 1943. The contract said that it was intended that notice to proceed on Schedule II would be issued not more than 60 days after notice to proceed on Schedule I. This would have made the notice effective as to the plaintiff about November 3, had the full 60 days been used. The same contract also said that, "It is planned to issue notice to proceed on Schedule II as soon as the grading of one runway has been completed in a manner acceptable to the Government and not more than sixty (60) days after notice to proceed has been issued on the clearing, grubbing, plowing, grading, etc." un-

der Schedule I. This would have made the plaintiff's notice to proceed effective on November 4. The contract provided, finally, that "Notice to proceed will be at the convenience of the Government." These four positions may be referred to in our findings 10, 13, and 31. The plaintiff says that it relied upon the statement in the letter of September 13, 1943, which transmitted the proposed contract the defendant sent to the plaintiff, but as we have said heretofore, it was an expression upon which the plaintiff did not rely. The true intent of the parties is merged into the written contract itself. We find it unnecessary to determine which of the three dates fixed by the contract would govern since the first two dates under the contract materialized at about the same ultimate period of time as heretofore noted, November 3 and 4, respectively. Had the Government proceeded at its convenience by issuing an order to proceed on November 8, it would have asked the plaintiff to proceed about as soon as the plaintiff was ready for full operation which was not until November 5, although it had actually commenced setting forms on November 3. We therefore, do not sustain the claim for damages for alleged breach of the contract at its inception.

We have found that the plaintiff's contract time for completion, with extensions, expired on June 1, 1944. The plaintiff actually completed contract operations on June 13, 1944, and was assessed liquidated damages at the specified rate of $500 per day for a total of $6,000. The plaintiff accepted this assessment under protest and appealed therefrom as required under the "Disputes" article of the contract. The appeal having been denied, the plaintiff now seeks to recover these liquidated damages in this action on the grounds that the assessment was unreasonable, arbitrary, in bad faith, and contrary to the terms of the agreement pertaining to the construction of the extensions of the original runways. The circumstances leading up to this agreement are outlined in our finding 18. The instant problem is to determine the date from which the 50-day extension agreed on was to run. The plaintiff says that the 50-day extension provided by the supplemental

contract, by reason of the language contained in one of plaintiff's letters, should start to run after May 16, 1944, when the last of the extensions was graded and turned over to the plaintiff for paving. The defendant says the time should run from April 12, 1944, when the original contract period of 60 days ended.

In resolving the above problem it is pertinent to see how it arose. The plaintiff on February 21, 1944, submitted a bid which stated, in part, as follows: "It is requested that the contract time be extended sixty (60) calendar days to allow a sufficient period for the construction of concrete pavement on the extended runways and taxiways."

On March 27, 1944, the plaintiff wrote to the defendant, stating: "In reference to our telephone conversation of March 26, 1944, please be advised that we will reduce time to complete extensions to fifty (50) days instead of sixty (60) previously requested, after graded runways are turned over to us."

The defendant replied to this by letter dated April 19, 1944, referring to the letter of March 27 reducing the time from 50 to 60 days, and said: "Your quotation has been accepted and an approved copy, designated as Supplement No. 1 to the contract * * * is enclosed."

The defendant apparently accepted the modified bid containing the additional language quoted above, " * * * after graded runways are turned over to us." The supplemental contract itself, however, provided for a "fifty (50) day extension of time" and was executed by the plaintiff without reservation or further comment. In the construction of a contract, the words of the contract are controlling, all prior documents and negotiations being merged therein. Callahan Construction Co. v. United States, 47 Ct.Cl. 177. Accepting this proposition, it still leaves unanswered the question of when the 50 days of time was supposed to have started to run. The agreement is ambiguous and is still so when viewed in the light of the correspondence leading to its creation. But, the interpretation urged by the plaintiff would lead us to a conclusion which we cannot believe to

have been within the contemplation of the parties. The reasonable and probable interpretation must be the one which is fair and consistent and not contrary to the common usage. A. Leschem & Sons Rope Co. v. Mayflower G. M. & R. Co., 8 Cir., 173 F. 855, 35 L.R.A.,N.S., 1; Star-Chronicle Publishing Co. v. New York Evening Post, 2 Cir., 256 F. 435; American West African Line v. United States, 76 Ct.Cl. 235, certiorari denied 290 U.S. 628, 54 S.Ct. 48, 78 L. Ed. 547; Moran v. Prather, 23 Wall. 492, 90 U.S. 492, 503, 23 L.Ed. 121; and Hawkeye Commercial Men's Association v. Christy, 8 Cir., 294 F. 208, 213, 40 A.L.R. 46.

If the plaintiff's interpretation of the contract is accepted, the contract period becomes uncertain and dependent upon the future action of the grading contractor and the original contract period of 60 days is rendered meaningless. This period actually ended on April 12, 1944. If the supplemental contract extension did not commence until May 16, 1944, liquidated damages might be assessable for the period from April 12 to May 16, since it is clear that the original contract work was not completed until after the latter date. Approximately 12,000 feet of paving was involved in the original 60-day contract. It is unreasonable to believe that the defendant, in its desire to get this airport finished, would have proceeded as the plaintiff contends to pave extensions aggregating only 1,000 feet. Inasmuch as the original contract work had not yet been completed, it logically follows that the increase in contract time authorized by the supplement applied to all work under the contract instead of to only that portion covered by the supplemental agreement. As a matter of good construction practice it was necessary for the work under the original contract and the supplement to be performed concurrently. We believe that the method used by the contracting officer in computing contract time is in accordance with the intent of the contract provisions. It was the only just and reasonable method possible of use in this situation and hence the liquidated damages were properly assessed in good faith.

The plaintiff has urged other grounds as a basis for alleged error in the assessment of liquidated damages as follows: (1) failure to give notice to proceed and furnish the site, (2) failure by defendant timely to bore certain core holes which could not be filled until they were bored by the defendant, and (3) engineering errors by the defendant for which plaintiff was given no credit. We have carefully examined the whole record respecting these contentions and find them without merit in fact or law. We have also given attention to the proof which constitutes a formidable record in this case concerning the alleged lack of cooperation by Tyler (the grading contractor under Schedule I), the favored treatment said contractor received from the defendant which is said to have delayed the plaintiff's proceed order to its detriment, and whether, as a matter of law, such facts, if established, would entitle the plaintiff to damages or to the remission of liquidated damages assessed. None of the premises upon which such legal conclusions must be founded are established by the facts. The plaintiff itself seems to have abandoned these original contentions and relies in its brief chiefly upon the alleged breach of the contract at the inception for the major portion of its claim. This we have previously disposed of. If, in fact, the plaintiff was delayed by lack of cooperation from Tyler, it simply neglected to compel his full cooperation. (Findings 6 and 33.) Tyler, the contractor on Schedule I, could have been assessed liquidated damages at the rate of $500 per day for each day after 60 calendar days from notice to proceed on Schedule I which the contractor (plaintiff) for Schedule II was delayed due to failure of the contractor for Schedule I to complete runway and taxiway strips in a manner acceptable to the Government in units as required to keep paving operations continuous. There was no evidence of any attempt by the plaintiff to ask for or compel the same or even to complain about the purported dilatory actions of Tyler. Moreover, the record establishes that the plaintiff was not entirely blameless for the difficulties it encountered in the job.

### The Counterclaim.

On June 9, 1944, it was noted by the Government inspection party that the

contraction and expansion joints in the pavement strips had not been prepared in accordance with the specifications. Again on June 14, 1944, a further Government inspection was made in which it was noted that the joints were unsatisfactory due to spalling, lack of filler, use of tar, and the failure of plaintiff to clean the joints, as a result of which the airport was in a serious condition. The plaintiff engaged in corrective operations between June 9 and 14, and although the proper report concerning the inspection of June 14 was made it did not reach the contracting officer until after the plaintiff was paid. On June 14 the defendant's project engineer who had knowledge of the defective workmanship, having accompanied both inspection parties, wired the Atlanta CAA office of the defendant that the plaintiff had completed the contract in accordance with the requirements (finding 24). As a result of this communication, final payment was certified and plaintiff received the contract price.

Subsequently, other inspections were made and the same defective conditions noted, and it was determined that in order to use the airport safely it would be necessary to repair the joints in such manner as to make them conform to the specifications. Accordingly, in the spring of 1945, a Government work party repaired and replaced the joints in order to bring them up to specifications. This work was done without notice to the plaintiff and in this Counterclaim defendant seeks the reasonable cost thereof in the sum of $8,043.47.

The defendant claims that the defective conditions were not discovered by it until long after the plaintiff had left the job and the work had been certified as complete. The facts are obviously to the contrary. Plaintiff contends that as a matter of law the defendant is not entitled to recover because it did not settle the dispute under Article 15 of the contract and because it did not give notice of the defective work to the plaintiff thereby permitting the plaintiff to take the corrective measures required. Defendant maintains but gives us no authority for the proposition that Article 15 is not applicable for the reason that it was designed only as a method for disposing of disputes which arose during performance of the contract in order that the work could proceed despite such disputes. This Article reads, in part, as follows: "Art. 15. *Disputes.*— Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer * * *. In the meantime, the contractor shall diligently proceed with the work as directed."

The defendant intimates that its project engineer was in collusion with the plaintiff, that he was generally guilty of "suspicious" conduct, that his certification for final approval of the job was so misleading as to be fraudulent and that the defendant paid the plaintiff by mistake thus induced. None of these matters were pleaded affirmatively as provided by the rules of this court and consequently they may or may not be true. Any incompetency of the defendant's agent cannot in any way be attributed to the plaintiff, nor can the plaintiff be charged with defendant's negligence in not transmitting its last inspection report to the contracting officer until after final settlement. A charge of fraud must be substantiated by clear and convincing proof which "must rebut every presumption of honesty and fair dealing." Unless the court fills in the gaps in the defendant's proof with inference and imagination, such a charge cannot be substantiated and certainly will not be inferred. Blakeslee v. Wallace, 6 Cir., 45 F.2d 347; Jewell v. Allen, 188 Okl. 374, 109 P.2d 235, 236. The same weakness in the defendant's proof at this point characterized the plaintiff's proof on its case in chief. Without attempting to characterize the actions or conduct of the defendant's agent from the record before us, it appears that the plaintiff acted in good faith when it engaged in the corrective operations from June 9 to 14, and it is presumed that it thought it had overcome the defective work as required by the defendant's inspection report of June 9. Had the project engineer been vigilant and diligent in the defendant's interests and had the plaintiff failed to make the proper corrections, we have no doubt that the sum sought in this Counterclaim could have been recovered, with or

598

without notice, in this court or by administrative procedure. But, where a contract has been performed and a stipulated consideration has been paid, the general presumption is that the transaction is a closed one. Poole Engineering & Machine Co. v. United States, 57 Ct.Cl. 232, 234. This presumption has not been rebutted as a matter of law or with such facts as to cast the clear and unmistakable onus upon the plaintiff.

Therefore, the plaintiff's petition as well as the defendant's counterclaim are hereby dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.