**TRI–O, INC.,**

v.

**The UNITED STATES.**

**No. 92–194C.**

United States Court of Federal Claims.

May 26, 1993.

Wilford A. Beesley, Salt Lake City, UT, for plaintiff.

Franklin E. White, Jr., Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Robert L. Jones, U.S. Dept. of Energy, of counsel.

## OPINION

YOCK, Judge.

This contract matter is before the Court on the parties' cross-motions for summary judgment. The plaintiff seeks damages, plus interest and attorney fees, resulting from a setoff by the defendant of amounts otherwise due plaintiff on a subsequent, unrelated contract. An oral hearing on the matter was held on April 13, 1993 in the National Courts Building in Washington, D.C. For reasons discussed herein, the plaintiff's motion for summary judgment is denied, the defendant's cross-motion is granted, and plaintiff's complaint is to be dismissed.

### Facts

On May 1, 1984, the Government, acting through the Bonneville Power Administration ("BPA"), awarded contract No. DE- AC79–84BP17263 to plaintiff, Tri–O, Inc. ("Tri–O"). The contract provided for the right-of-way preparation and construction of the Garrison–Taft power line project in the State of Montana.

The controversy concerns the proper construction of Clause E–79.2 of the contract, entitled "STATE OF MONTANA GROSS RECEIPTS TAX ON PUBLIC CONTRACTORS." Clause E–79.2 provides the following:

> The State of Montana imposes on public contractors a 1–percent gross receipt tax against which the contractors may credit payments on personal property, corporate and individual income taxes. This may result in a net gross receipts tax liability on the part of the contractor. Because the constitutionality of said tax may be subject to legal challenge, bidders shall not take into account the 1–percent gross receipts tax in arriving at their bids. If the said tax is assessed and levied, the contractor shall immediately notify the contracting officer who will advise the contractor as to the terms and conditions of paying the tax. Any gross receipts tax thus paid by the contractor shall be reimbursed by the Government. The contractor hereby agrees to pay to the Government the amount of any refunds of said tax received from the State of Montana in the event the tax is found to be invalid.

During the period June, 1984, through December, 1984, Tri–O paid the State of Montana a total of $85,551.60 in gross receipts tax. In accordance with Montana law, Tri–O received a refund of $6,779.62 in personal property tax because of its payment of gross receipts tax. On February 12, 1985, Tri–O submitted an invoice to BPA requesting reimbursement in the amount of $78,771.98 for payment of the gross receipts tax. Attached to the invoice were copies of checks from Tri–O to the State of Montana totaling $85,551.60 representing Tri–O's payment of gross receipts tax in 1984. In arriving at the reimbursement figure of $78,771.98, Tri–O deducted the $6,779.62 refund for personal property taxes that it had received from the State of

Montana as a result of its payment of the gross receipts tax. Modification No. M007, effective March 6, 1985, increased the contract price by $78,771.98 to reimburse Tri-O for the payment of the gross receipts tax in 1984.

On March 25, 1986, Tri-O submitted another invoice to BPA requesting reimbursement of $31,649.30 for payment of the gross receipts tax. Attached to this invoice were copies of checks from Tri-O to the State of Montana totaling $31,649.30, representing payments of the gross receipts tax. Although Tri-O had received a refund of personal property taxes in the amount of $7,246.72 attributable to its payment of gross receipts taxes for this same period of time, the March 25, 1986, invoice did not include a deduction for the personal property tax refund. Modification No. M019, effective March 31, 1986, increased the contract price by $31,649.30 to reimburse Tri-O for payment of the gross receipts tax for the period from February, 1985, to December, 1985, and January and March of 1986.

Tri-O completed work on the contract in early 1986. On June 11, 1986, Tri-O received a third refund of personal property taxes from the State of Montana. This refund was in the amount of $26,871.00 and, like the other two refunds, resulted from Tri-O's payment of gross receipts taxes. Tri-O did not notify BPA that it had received this refund.

Subsequently, BPA notified Tri-O by letter that, in accordance with the contract, final payment was conditioned upon Tri-O's execution of a standard "Release of Claims" form (BPA 1550). The letter informed Tri-O that in order to preserve any claims, Tri-O should list them on the release form, and that the BPA would be precluded "from considering any claims under the contract other than those shown on the release form." All claims and adjustments were ultimately negotiated and settled, and on June 25, 1987, Tri-O executed a final release of claims. The relevant language of the release provided the following:

[T]he contractor hereby remises, releases, and forever discharges the United States, its officers, agents, and employees, of and from all manner of debts, dues, liabilities, obligations, accounts, claims, and demands whatsoever, in law and equity, under or by virtue of the said contract * * *.

Following the execution of the release by Tri-O, BPA closed the contract and made final payment to Tri-O.

In 1988, a BPA audit determined that Tri-O had received refunds from the State of Montana as a result of its payment of the gross receipts tax that were not credited to BPA. On February 3, 1989, the contracting officer issued a "Bill for Collection" to Tri-O for $34,117.72. The cover letter, dated February 6, 1989, stated in relevant part:

Our records indicate that your firm was paid the amount of $110,421.28 by BPA [for gross receipts tax]. We have been informed by the State of Montana, Department of Revenue, that you and/or your subcontractor filed for and received off sets and refunds, due to payment of this tax, in the amount of $40,879.34. Accordingly, your firm is to refund BPA in the amount of $34,117.72.

By letter dated March 30, 1989, counsel for Tri-O responded to the Government's demand letter. The letter stated in part:

Tri-O is unable to agree with BPA's position in this matter and denies that any amount is due to BPA from Tri-O. No refund has been received by Tri-O which would trigger the relevant contract provisions. The government is further barred by its delay and its prior representations by the doctrines of laches and estoppel. The government is also precluded from reopening this matter when final payment and settlement was made nearly two years ago. Finally, the doctrine of accord and satisfaction would preclude recovery.

On October 11, 1989, the contracting officer issued a final decision that ordered Tri-O to refund BPA $34,117.72, plus interest accruing since the February 6, 1989 demand letter. Tri-O refused to pay. On November 22, 1989, BPA informed Tri-O that payment was overdue and that the

accrued interest through November 21, 1989, totaled $2,549.72. Again, Tri–O refused to pay. By letter dated January 25, 1990, BPA informed Tri–O that an administrative charge of $20.00 had been assessed and that accrued interest through January 24, 1990, totaled $3,081.59. The letter went on to state, "if it becomes necessary, [the Government] may collect by using administrative offset, collection agencies, or litigation."

On March 16, 1990, Tri–O filed a complaint for declaratory relief in the United States District Court for the District of Utah. Tri–O sought, in part, "an order adjudging and declaring the demands, claims and assessed interest, administrative charges and penalties asserted by BPA to be contrary to law."

On September 21, 1990, the Government set off $39,201.51 from payments due Tri–O on a subsequent contract. Tri–O then filed a motion to transfer pursuant to 28 U.S.C. § 1631 (1988). The district court granted Tri–O's motion to transfer on January 9, 1992. Tri–O filed an amended complaint in this Court on April 14, 1992, requesting that this Court order the Government to pay it $39,201.51, plus interest from September 21, 1990, and attorney fees.

### Discussion

Plaintiff relies on several theories to support its contention that the Government is not entitled to withhold the amounts representing plaintiff's refund of personal property taxes. First, plaintiff argues that the terms of the subject contract do not establish the Government's entitlement to the amounts claimed, and that, in the alternative, the language in the contract is ambiguous and should be construed against the Government. Second, plaintiff maintains that because the parties entered into a negotiated settlement, plaintiff executed a release of claims, and the Government issued final payment on the contract, the Government is barred from withholding the claimed amounts under the doctrine of accord and satisfaction. Finally, plaintiff contends that the Government's claim and withholding of funds is barred by the doctrine of laches and/or estoppel.

The Government responds that the terms of the subject contract only required the BPA to reimburse Tri–O in an amount equal to Tri–O's *net* increased tax liability resulting from Montana's assessment of the gross receipts tax. Next, the Government argues that its claim against Tri–O is not barred by either the doctrine of accord and satisfaction or the final payment rule. To this end, the Government argues that there was no accord and satisfaction because the Release of Claims executed by Tri–O did not contain a waiver by the Government of claims against Tri–O. In addition, the Government contends that the final payment rule does not apply in the absence of a specific contractual provision stating that Government claims are barred after final payment. Finally, the Government maintains that the doctrines of laches and estoppel do not generally bar claims against the United States and that, in any event, the necessary elements of those defenses have not been shown.

### I. Contract Interpretation

This case is, at its essence, one of contract interpretation. Plaintiff contends that the words of the contract establish its entitlement to the amounts withheld by the Government. Plaintiff relies on Section E–79.2 of the Contract, which provides the following:

The State of Montana imposes on public contractors a 1–percent gross receipt tax against which the contractors may credit payments on personal property, corporate and individual income taxes. This may result in a net gross receipts tax liability on the part of the contractor. Because the constitutionality of said tax may be subject to legal challenge, bidders shall not take into account the 1–percent gross receipts tax in arriving at their bids. If the said tax is assessed and levied, the contractor shall immediately notify the contracting officer who will advise the contractor as to the terms and conditions of paying the tax. Any gross receipts tax thus paid by the con-

tractor shall be reimbursed by the Government. The contractor hereby agrees to pay to the Government the amount of any refunds of said tax received from the State of Montana in the event the tax is found to be invalid.

In support of plaintiff's argument that it is entitled to the amount representing the refund of personal property taxes, plaintiff focuses on the last two sentences of Section E–79.2. According to plaintiff, these sentences establish that the Government must reimburse plaintiff for all gross receipts taxes paid by plaintiff and that plaintiff is only required to make payment to the Government if: (1) the gross receipts tax is found to be invalid, and (2) plaintiff receives a refund of that gross receipts tax. Plaintiff contends that it is entitled to recover the amount withheld by the Government by setoff because that amount represents a refund of personal property tax, not gross receipts tax, and because the gross receipts tax was not found to be invalid.

The Government contends that plaintiff's construction of Section E–79.2 contravenes the spirit and purpose of the contract. In the Government's view, the first two sentences of Section E–79.2 establish that the Government only agreed to reimburse Tri–O for the amount of Tri–O's net increase in tax liability as a result of the assessment of gross receipts tax. Thus, the Government argues that the plaintiff was obligated to return the amount representing the refund of personal property taxes because the contract never authorized those payments to begin with, not because a particular contract provision specifically required that plaintiff return the money.

▮ In construing the contract, this Court is guided by the well settled principle that the terms of a contract must be given their plain, ordinary meaning unless it is shown that the parties intended otherwise. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *S.E.C. v. White & Co.*, 546 F.2d 789, 792 (8th Cir. 1976); *Thermal Elec., Inc. v. United States*, 25 Cl.Ct. 671, 673 (1992). The context in which the contractual terms are used and the intentions of the parties are more meaningful than dictionary definitions. *Corman v. United States*, 26 Cl.Ct. 1011, 1015 (1992); *Fry Communications, Inc. v. United States*, 22 Cl.Ct. 497, 503 (1991). In all cases, the contract must be considered as a whole and interpreted in a way that will harmonize and give meaning to the various words and provisions. *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057 (Fed.Cir.1983); *Thanet*, 219 Ct.Cl. at 82, 591 F.2d at 633. Underlying this is the requirement of reasonableness. " '[A]n interpretation which gives a reasonable meaning to all [parts of a contract] will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)).

With these concepts in mind, the Court now turns to the contractual provision at issue, Section E–79.2. From the outset, it is obvious that the outcome of this dispute does not turn on the last sentence of Section E–79.2. This sentence provides that a contractor must "pay to the Government the amount of any refunds of [gross receipts] tax received from the State of Montana in the event the tax is found to be invalid." This sentence does not apply because plaintiff did not receive a refund of gross receipts tax. Instead, plaintiff received refunds of personal property tax because of its payment of the gross receipts tax. Moreover, the gross receipts tax was not found to be invalid. Therefore, for purposes of analysis here, this last sentence of Section E–79.2 is inapposite and may be disregarded.

▮ Plaintiff's next argument is that the language of the penultimate sentence should govern the interpretation of the section. To reiterate, this sentence provides, "[a]ny gross receipts tax thus paid by the contractor shall be reimbursed by the Government." Plaintiff urges the Court to read into this provision a duty on the part of the Government to reimburse plaintiff

for all gross receipts taxes assessed and levied upon plaintiff as a result of its contract with BPA, without regard to the various tax refunds that plaintiff received solely by virtue of having to pay the gross receipts tax. In the Court's view, this interpretation of Section E–79.2 produces an odd result. Instead of simply eliminating the financial burden of the gross receipts tax on public contractors, the interpretation of Section E–79.2 urged by plaintiff goes further and transforms the gross receipts tax into a financial windfall for public contractors. Under plaintiff's interpretation, the Government shoulders the tax burden, while the public contractor profits from the tax refunds at the Government's expense. This Court does not believe that the parties intended such a scenario.

When read in its entirety, the language of Section E–79.2 indicates that the parties intended the Government to reimburse the plaintiff for the net increase in tax assessed and levied. The first two sentences of Section E–79.2 set the stage for the rest of the paragraph. Like topic sentences, they provide a framework for analyzing the provisions that follow. These two sentences recognize that public contractors may be left with a "net gross receipts tax liability" after the applicable credits on payments of personal property, corporate, and individual income taxes are taken into account. The section goes on to state, "[a]ny gross receipts tax thus paid by the contractor shall be reimbursed by the Government." It is apparent to this Court that the phrase "any gross receipts tax thus paid" refers to the previously mentioned net gross receipts tax liability that the contractor is left with after the appropriate credits and deductions are taken. If the parties had intended the Government to reimburse the contractor for all gross receipts taxes paid by the contractor, without regard to any tax refunds received by the contractor as a result of its payment of gross receipts tax, there would have been no need to use the term "net gross receipts tax liability" in the beginning of the paragraph or to mention the various tax refunds to which the contractor would be entitled. An adoption of plaintiff's interpretation of the contract would render these passages superfluous. The Court does not believe that such an interpretation comports with the plain language of the contract.

Plaintiff's argument in the alternative is that the inclusion of the term "net gross receipts tax liability" in the prefatory language of Section E–79.2 creates an ambiguity. Therefore, plaintiff argues, the provision in dispute should be construed against the Government because the Government, as drafter of the agreement, failed to clearly state how to handle the credits and reductions on other taxes.

 It is a basic principle of contract law that a contract is ambiguous if it sustains the interpretations adopted by both parties. *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970). Underlying this is the requirement that the two interpretations must both be reasonable. *International Business Inv., Inc. v. United States*, 17 Cl.Ct. 122, 125 (1989), *aff'd*, 895 F.2d 1421 (Fed.Cir.1990). A careful reading of the contract reveals that Section E–79.2 can reasonably sustain only one interpretation. For the same reasons as those set forth in the preceding discussion, this Court does not believe that a reasonable contractor would interpret Section 79.2 to allow the contractor to receive full reimbursement from the Government for all gross receipts tax paid to the state and at the same time retain all state tax refunds received solely as a result of that payment. Moreover, the fact that the invoice dated February 12, 1985, contained a deduction for the first personal property tax refund received by plaintiff suggests that at least initially, plaintiff interpreted Section E–79.2 of the contract in the same way as the Government. In the absence of an ambiguity, the plain language of the contract controls. *Thermal Elec.*, 25 Cl.Ct. at 673. Therefore, in accordance with the plain language of the agreement, the plaintiff was entitled to reimbursement from the Government in the amount of its net increase in tax liability, and no more.

## II. Accord and Satisfaction

Plaintiff next argues that regardless of the plain meaning of the agreement, the Government is precluded from withholding the claimed amounts under the doctrine of accord and satisfaction and the principles of Government contract law regarding the effect of final payment to the contractor. It is plaintiff's position that the compromise adjustment in the contract price agreed to by the parties in July of 1987, pursuant to which plaintiff executed a release of all claims and the Government made final payment to plaintiff, constitutes an accord and satisfaction which bars further claims by both parties under the completed contract.

The Government responds that the release of claims executed by plaintiff does not constitute an accord and satisfaction that would bar subsequent Government claims because there is nothing in the language of the release that could be construed as a waiver by the Government of any claims against the plaintiff. According to the Government, the release executed by plaintiff, which was a contractual prerequisite to final payment by the Government, only operates as a release and discharge by plaintiff of any contractual claims against the Government. Moreover, the Government argues that the final payment rule does not apply because the subject contract does not contain any provisions requiring that a Government claim be brought within a specified time limit.

■■■ Under traditional contract principles, accord and satisfaction denotes a " 'discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction' " of the claim. *Emerson–Sack–Warner Corp. v. United States*, 189 Ct.Cl. 264, 277, 416 F.2d 1335, 1343 (1969) (quoting *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965)). The "accord" is the parties' bilateral agreement to settle the claim once certain conditions are met, such as the Government's payment of an agreed upon dollar amount to the contractor. *Chesapeake*

*& Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981). The "satisfaction" is the performance of that agreement which occurs when the stated conditions are met, for example, when the specified sum is actually paid. *Id.* There are three elements that must be present in order for there to be an effective accord and satisfaction: (1) a bona fide disputed claim between the Government and the contractor, (2) an agreement to settle the disputed claim in return for substituted performance, and (3) an acceptance of the substituted performance in full satisfaction of the disputed claim. CARL L. VACKETTA, *Settlement & Release, in* No. 80–6, THE GOVERNMENT CONTRACT BRIEFING PAPERS 165, 166–67 (Dec.1980). The critical element of an accord and satisfaction is the intention of the parties. *Black v. Denver United States Nat. Bank*, 362 F.2d 38, 41 (8th Cir.1966), *cert. denied*, 385 U.S. 990, 87 S.Ct. 596, 17 L.Ed.2d 451 (1966). For this reason, a settlement will not operate to bar disputed claims which were not considered by the contractor and the Government at the time of the settlement agreement. VACKETTA, *supra*, at 167. When an accord and satisfaction is shown, "its effect is often to bar all subsequent claims arising out of [the] alleged breach of the original duty which was the subject of the dispute." JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 928 (2d ed. 2d printing 1986).

For analytical purposes, plaintiff's accord and satisfaction defense is best applied to two separate, but related events: (1) the release of claims that plaintiff was required to execute as a prerequisite to final payment, and (2) the negotiated settlement agreed to by the parties pursuant to which the Government issued final payment on the contract. The Court will examine these events in turn.

### A. *Release of Claims*

■■■ In analyzing the issue of accord and satisfaction, it is important to distinguish between the essentially bilateral nature of a settlement and the unilateral nature of a release. By definition, the "ac-

cord" element in an accord and satisfaction denotes the parties' bilateral agreement to settle the claim under certain conditions. *Chesapeake & Potomac Tel. Co.*, 228 Ct.Cl. at 108, 654 F.2d at 716. The release of claims signed by the plaintiff on June 25, 1987 forever discharged the Government from all contractor claims under the contract. Although it is true that the release was a prerequisite to the issuance of final payment by the Government, the release itself was a wholly unilateral agreement signed only by the plaintiff. As such, the release does not fit the mold of an accord and satisfaction because it was not a "mutual agreement [between the parties] * * * in satisfaction of a claim or demand which is a bona fide dispute." *Emerson–Sack–Warner*, 189 Ct.Cl. at 278, 416 F.2d at 1343 (citing *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965)). This does not mean that the release was of no effect, only that the effect of the release must be determined with reference to established principles of contract interpretation.

█ As with any other contract, the first step in determining the scope and effect of a release of claims is to examine the language used in the release. The relevant portion of the release provides the following:

> [T]he contractor hereby remises, releases, and forever discharges the United States, its officers, agents, and employees, of and from all manner of debts, dues, liabilities, obligations, accounts, claims, and demands whatsoever, in law and equity, under or by virtue of the said contract except: [nothing listed].

There is nothing in the language of the release to support a holding by this Court that the parties contemplated a discharge of any subsequent claims by the Government against plaintiff. The language of the release clearly indicates that the plaintiff released all of its claims against the Government on the contract, but there is no similar language applicable to contractual claims of the Government against the plaintiff. Plaintiff asserts that it would not have settled and released its claims if it

thought that the Government would be allowed to raise claims on the contract at a later time. Whatever plaintiff's subjective intentions may have been, this outcome was never agreed to by the parties.

**B. Settlement and Final Payment**

█ Plaintiff contends that, notwithstanding the language of the release, the negotiated settlement of final amounts and the issuance and acceptance of final payment of those amounts operates as an accord and satisfaction which supersedes the underlying contract and bars further claims under the completed contract. In support of this assertion, plaintiff cites three cases: *Early and Daniel Co. v. United States*, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926); *Francis v. United States*, 96 U.S. 354, 24 L.Ed. 663 (1878); *Poole Eng'g & Mach. Co. v. United States*, 57 Ct.Cl. 232 (1922). It is significant, however, that in each of these cases the doctrine of accord and satisfaction was applied against the contractor, not the Government. Moreover, all of these cases involved claims that were based on facts and circumstances known to the claimant at the time final payment was accepted. In *Poole Eng'g*, the United States Court of Claims explained the importance of this fact as follows:

> When a contract has been performed and a stipulated consideration has been paid the general presumption is that the transaction is a closed one. If there be claims on the part of the Government which should limit the amount of a stipulated payment necessary to close the transaction they are asserted, and, generally speaking, are deducted *if they are known at the time.* If there are claims on the part of the contractor which affect the amount due and payable to him under the terms of the contract, * * * they should be asserted at or before the time a settlement is made. The Government is entitled to know, when it makes what it believes to be a final payment on its contract, what claims a contractor intends to assert against it on account of the contract. * * * It has been frequently said that if a party keeps silent when

he ought to speak he will not be heard thereafter to speak when he ought to remain silent.

*Poole Eng'g,* 57 Ct.Cl. at 234 (emphasis added). Unlike the claimant in *Poole Eng'g,* the Government in the case at hand was unable to assert its claim at the time of final payment because at that time the Government was not aware of the existence of the events giving rise to a claim. It was not until the completion of the BPA audit in 1988 that the Government gained the knowledge that the plaintiff had received refunds of personal property tax that had gone unreported under the contract.

In its reply brief, plaintiff directed the Court's attention to a case where the Court of Claims held that the Government's claim was barred after final payment had been made even though the Government claimed it did not know of the basis for the claim until after the final payment. *See DuBois Constr. Corp. v. United States,* 120 Ct.Cl. 139, 98 F.Supp. 590 (1951). The *DuBois* case is readily distinguishable from the case at hand. The contract in *DuBois* contained a disputes clause which required that all disputes concerning questions of fact be decided by the contracting officer. The court's denial of the Government's claim in *DuBois* was based in a large part on the Government's failure to follow the procedures set forth in the disputes clause. In addition, although the Government in *DuBois* insisted that it did not know of the defective workmanship until final payment was certified, the Court of Claims explicitly found otherwise. *Id.* at 163–64, 98 F.Supp. 590 (noting that the Government's project engineer had accompanied two Government inspection parties and knew of the defective workmanship). Unlike *DuBois,* in this case there is no contention that the Government's course of action in asserting its claim was procedurally defective. Similarly, the Government's assertion that it was unaware of the facts underlying its present claim until after final payment had been made is uncontested.

Under the circumstances, this Court is unable to find an accord and satisfaction that would bar the Government from asserting its present claim on the contract. Plaintiff is correct in noting that, in the usual sense, the negotiation of a settlement and the issuance of final payment constitute an accord and satisfaction. This process, however, only operates as an accord and satisfaction as to the claims considered during the settlement negotiations. "A settlement will *not* bar disputed claim matters which were not bargained over or considered * * * at the time of the agreement on the settlement." VACKETTA, *supra,* at 167. In such a case, a fundamental element of accord and satisfaction is lacking; namely, an agreement (or "meeting of the minds") to settle the disputed claim.

■ Although the issue was not expressly raised by the plaintiff, for the sake of clarity the Court will briefly discuss the applicability of the final payment rule. The so-called "final payment rule" is a separate and distinct doctrine that precludes the assertion of a claim by either party to a Government contract after final payment *if the terms of the contract so provide. American W. Corp. v. United States,* 730 F.2d 1486, 1488–89 (Fed.Cir.1984); *Design and Prod., Inc. v. United States,* 18 Cl.Ct. 168, 211 (1989). Thus, the legal effect of final payment depends upon the express language of the contract. *American W. Corp.,* 730 F.2d at 1488. Plaintiff has not pointed to any contractual provision that would lead this Court to conclude that the parties intended to preclude the assertion of claims by the Government after final payment. In the absence of such a contractual provision, the final payment rule does not apply. Therefore, the mere issuance of final payment by the Government to Tri-O does not operate as a bar to subsequent Government claims on the contract.

### III. Laches and Estoppel

In a final effort to prevail, the plaintiff argues that the Government's claim and withholding of funds is barred by the doctrine of laches and/or estoppel. Specifically, the plaintiff argues that to allow the Government to assert a claim in 1989 based

on refunds and credits dating from 1986 and 1987 and then withhold that amount in September of 1990 would result in undue prejudice and injury to plaintiff. Plaintiff insists that it released its claims against the Government under the contract in 1987 on reliance on the belief that the Government would not later assert other claims arising out of events that occurred prior to the settlement. Moreover, the plaintiff contends that excess Montana income taxes and bond premiums it paid cannot be rectified or refunded at this late date due to the passage of time.

 To begin with, it is unclear whether the defense of laches is even available against the Government in a contract case. *Jana, Inc. v. United States,* 936 F.2d 1265, 1269 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992) (citing *S.E.R., Jobs for Progress, Inc. v. United States,* 759 F.2d 1, 6–9 (Fed.Cir.1985)). In *S.E.R., Jobs for Progress,* the United States Court of Appeals for the Federal Circuit addressed the conflicting authority on this issue and concluded, "we do not think that the thrust of the decisions is that laches is always inapplicable *per se* in any contract or other claim where a legal rather than an equitable remedy is sought." *Id.* at 8–9. Even if the laches defense is available, however, the necessary elements have not been met in this case. The elements of laches are: (1) an unjustified delay in bringing an action, and (2) resulting prejudice to the party asserting laches. *Lane v. United States,* 225 Ct.Cl. 209, 213, 633 F.2d 1384, 1387 (1980). Given the circumstances, the Court is unable to conclude that the Government exercised an unjustified delay in asserting its claim in 1989. It is true that the events giving rise to the claim—the plaintiff's retention of tax refunds received as a result of payment of gross receipts taxes—occurred in 1986, prior to the negotiation and settlement of claims effectuated by the parties on June 25, 1987. However, the Government was unaware that these events had occurred at the time of the settlement. The Government did not know, and had no reasonable means of knowing, that plaintiff had requested and received refunds of personal property tax that were not reported under the contract, until BPA completed the audit in 1988. This being the case, the Court finds no unjustified delay in the Government's assertion of its claim in 1989.

 Plaintiff has also raised the defense of estoppel. Again, it is dubious whether this defense may be asserted against the Government. *Jana,* 936 F.2d at 1270 (citing *OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990)). In *Richmond,* the United States Supreme Court held that, absent fraud by the Government, the defense of estoppel would not be a valid defense against the Government in suits to compel the payment of money from the public fisc in contravention of eligibility requirements contained in an Act of Congress. *Richmond,* 496 U.S. at 424–34, 110 S.Ct. at 2471–77. The precise effect of *Richmond* on contract cases is unclear, primarily because the awards sought by Government contractors are generally based on contract principles that do not contravene the eligibility requirements contained in federal statutes. However, even if the estoppel defense may still be asserted against the Government in a contract case, the plaintiff cannot prevail here. According to pre-*Richmond* caselaw, four elements must be shown to establish the estoppel defense in a Government contract case: (1) the Government must know the true facts, (2) the Government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended, (3) the contractor must be ignorant of the true facts, and (4) the contractor must rely on the Government's conduct to his injury. *American Elec. Lab., Inc. v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985). Any attempt to match these elements with the facts of the present case proves futile. In this case, it was plaintiff who knew the true facts all along; not the Government. This alone eliminates the first and third elements. Although it may be argued that plaintiff relied on the Government's conduct to its injury, it can hardly be said that the Government intended its conduct to be acted upon when the Government was oblivious to the relevant facts at the time of the settlement. Thus, even assuming,

without deciding, that the defense of estoppel may be asserted here, plaintiff has not established the requisite elements of an estoppel defense in this case.

For all of the above discussed reasons then, the Court concludes that the Government prevails in this refund action. The Government was within its rights in offsetting the amounts owed by the plaintiff on this contract. *See* 28 U.S.C. § 1503 (1988).

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. The Clerk is directed to dismiss the Complaint.

Each party shall bear its own costs.