## WHITE, RECEIVER OF COWARDIN, BRADLEY, CLAY & CO. *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 309. Argued April 19, 1916.—Decided May 1, 1916.

As the plans annexed to the contract for construction of a filtration plant and reservoir showed a roadway around the reservoir, as also did plans subsequently furnished the contractor, and the engineer in charge of the work, gave the grade lines of such roadway, and the voucher for the first payments included work thereon, *held*, that although there was ambiguity in the contract, the roadway was included in the contract and the contractor is entitled to be compensated for work done thereon in accordance with the terms of the contract.

48 Ct. Cl. 169, reversed.

APPELLANT is the receiver of the firm of Cowardin, Bradley, Clay & Company, and the successor of one John D. McClennan. The latter filed in the Court of Claims a petition, subsequently amended by appellant, praying a judgment against the United States for the sum of $43,510, the amount due that company on a contract for labor and materials furnished for the construction of a filtration plant in the District of Columbia.

The court found, among other things, that there is a driveway running completely about the reservoir, which is an irregularly shaped body of water, comprising the western and southern part of the filtration plant. The starting point of "the roadway" (so-called by the court), its course and termination are stated.

The set of plans attached to the written contract and by its terms made a part of the agreement included certain plans showing the roadway bordering the reservoir west of the filter beds. One of the plans (sheet 2) was a draw-

ing showing the work in general sections; another plan (sheet 4) was a general plan and showed finished surfaces; and general plan No. 1 showed the entire projected plant. All of these plans indicated a roadway, and sheet No. 16 also indicated a roadway.

· Afterwards two supplemental plans, relating to the roadway and giving details as to grades, were furnished the contractor.

Appellant's predecessor, McClennan, began work on the roadway in January or February, 1904. It does not appear that the contractor was ordered in terms by the Government engineers to build the roadway but it is shown that when he commenced work on it the engineers gave him the line of the toe of the slope and from time to time furnished him with the lines showing the direction of the road and the stakes showing the grade, and that the work was done under their inspection as to the lines, slopes, and the character of the material allowed to be deposited thereon.

The contractor began to build the roadway by filling with earth excavated from other parts of the work, and he continued to fill in and build the roadway in accordance with the plans and under the inspection of the engineers until February 14, 1905, and had been paid at various times about $12,000 on account of the work done on estimates made by the Government. The first payment was on voucher, month of March, 1904, covering all work done on the road up to the end of February, 1904, for "embankment (A, item No. 2), 13,000 cubic yards, at 30 cents, less 10 per cent. retained, amounting to $3,510." Except for said voucher no separate estimates were made of the amount of fill placed in the roadway, the work done thereon being included in the regular monthly estimates with the work done on other portions of the filtration plant.

Shortly after McClennan was appointed receiver in

August, 1903, he made arrangements with the Soldiers' Home authorities, at a considerable cost, to dispose of waste material on the Soldiers' Home grounds under certain conditions, the terms of which, so far as the amount of material to be placed thereon is concerned, were never carried out. The roadway was just as convenient a place as any to dispose of waste material and the cost of putting it there was no more than it would have been to have placed it on the Soldiers' Home grounds.

McClennan, he then being receiver, was informed by the engineer officer in charge on behalf of the United States that he would not allow any further payments for work done on the roadway. For a short time afterward and pending negotiations regarding the matter with the engineer officer appellant continued dumping material that he wanted to dispose of on the roadway. He finally discontinued work thereon,.at which time about 6,000 cubic yards of fill was necessary to complete the roadway. It was subsequently finished by the United States without further cost.

In the final settlement there was deducted from the amount paid a sum equal to such of the fill in the roadway as had been paid for at the rate of 30 cents per cubic yard, amounting to about $12,000.

"On or about February 15, 1904, the Government engineer in charge had cross sections taken over the line of the roadway in question, which cross sections were used in computing the amount of work done by the contractor thereon outside of the lines allowed and paid for in the final estimate, and the amount of fill so made and not paid for was found to be 67,578 cubic yards, which at 30 cents per cubic yard amounts to $20,273.40."

From these facts the court concluded that appellant was not entitled to recover and dismissed the petition. Judgment was entered accordingly and this appeal was then prosecuted.

*Mr. Chauncey Hackett* for appellant.

*Mr. Assistant Attorney General Huston Thompson* for the United States.

MR. JUSTICE McKENNA, after stating the facts as above, delivered the opinion of the court.

It appears from the findings that the plans showed a roadway bordering the reservoir. This finding seems to be contested by the Government, the contention being that where the roadway was to be placed was "merely marked" and no detail whatsoever as to its exact location or dimensions was shown by the plans. The finding, however, is more specific. One of the plans showed the work in general sections and indicated the roadway; another showed finished surfaces, with the roadway thereon; still another showed the entire filtration plant, the road again being indicated, and it was marked again on another plan. Such persistent repetition must have had other purpose than mere designation, and, besides, there were supplemental plans furnished the contractor relating to the roadway, giving detail as to grades. And, further, the engineer in charge gave the "toe of the slope" to the contractor and "from time to time furnished him with the lines showing the direction of the road and the stakes showing the grade." "The lines, slopes, and the character of the material allowed to be deposited thereon" were under his inspection.

The force of these findings is added to by the fact that the engineer first in charge and under whom the work was commenced on the roadway drew the plans and his action was their interpretation. It was not inadvertent. The first payment to the contractor was on a voucher which contained the work on the road as an item of liability, and, though subsequent vouchers omitted such

specification, work on the roadway was included in the regular monthly estimates. And this continued until a new engineer came upon the scene. With him came controversy. He not only introduced a new construction of the contract but so far reversed the construction and action of his predecessor as to deduct in the final settlements the amounts allowed by the latter.

Undoubtedly the contract has ambiguity and to present and resolve the ambiguity in detail would require a precise and literal examination of the contract. Such examination would greatly and, we think, uselessly prolong this opinion. We should be brought nevertheless to a few broad determining considerations.

The contention of the Government is based upon what is said to be the purpose of the contract, which, it is further said, "*so far as appellant was concerned* [italics counsel's], was the construction of the filtration plant proper." The appellant, in opposition, declares that the contract enumerated three kinds of fills "and all other fills and embankments shown by the plans or directed to be made by the engineer officer in charge." Though some doubts beset appellant's contention and some considerations bear against it, there are others which determine for it. The most important of the considerations against it is the charge by the Government that the contractor was paid for every yard of excavation and that the dirt excavated had to be deposited somewhere and the roadway "was just as convenient a place as any to dispose" of it. And this is given strength by the fact that the contractor had arranged, at a considerable cost, with the Soldiers' Home authorities to dispose of waste material on the grounds of the Soldiers' Home.

But there is the countervailing consideration to which we have adverted, that is, of the action of the engineer first in charge, and it was he who drew the contract. He was there for direction. He considered that the roadway

was part of the scheme. He directed and superintended its construction. And it was a systematic structure, not a mere dumping place or deposit for material. It was constructed upon lines, slopes and grades and of selected materials. Further, in continued manifestation of his judgment that the contract included it and in approval of its conformity to the contract, he directed payment for it. There is nothing which reflects upon the sincerity of his judgment and it is necessarily the important factor in determining the responsibility of the Government.

.Whether the roadway was necessary or accessory to the filtration plant is not important to consider. We may observe, however, that it was subsequently finished by the United States, and manifestly deemed desirable.

*Judgment reversed and cause remanded with directions to enter judgment for appellant on the findings and in accordance with this opinion.*

MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.