THE CENTURY INDEMNITY COM-
PANY, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 12947.

United States Court of Appeals
District of Columbia Circuit.

Argued May 10, 1956.
Decided Aug. 9, 1956.

---

1. Snowden v. United States, 1893, 2 App. D.C. 89, 93.

Mr. Alexander M. Heron, Washington, D. C., with whom Messrs. Joseph A. Carey and Donald S. Dawson, Washington, D. C., were on the brief, for appellant.

Mr. John G. Laughlin, Jr., Atty., Dept. of Justice, with whom Messrs. George S. Leonard, Acting Asst. Atty. Gen., Oliver Gasch, U. S. Atty., and Samuel D. Slade, Atty., Dept. of Justice, were on the brief, for appellee.

Before PRETTYMAN, WILBUR K. MILLER and FAHY, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

In the Government's suit against Century Indemnity Company to recover $34,-867.87 allegedly due from it as surety for Spencer Wire Company on an advance payment bond, the District Court awarded judgment for the amount claimed. The surety appeals.

By a contract dated February 9, 1942, Spencer Wire Company agreed to manufacture and sell to the United States a quantity of wire rope at a total price of $581,405.00, delivery to be made during that month. The Government agreed to make an advance payment of $145,351.25, and then to pay for each shipment upon delivery at stated unit prices, until the sum of such payments plus the advance payment should equal the total contract price; thereafter the remainder of the merchandise contracted for was of course to be delivered without further payment.

The contract provided for an advance payment bond to secure the repayment to the Government of the full sum advanced by it, or such part thereof as was not liquidated in accordance with the terms of the agreement. February 9, 1942, Century Indemnity Company, as surety for Spencer Wire Company, executed the advance payment bond contemplated by the contract in the penal sum of $145,351.25, and February 12, 1942, the Government advanced approximately that amount to Spencer.

Although the entire quantity of wire rope originally contracted for was required to be delivered during February, 1942, the requirement was not met by Spencer during that month or year. On January 2, 1943, obviously in order to expedite deliveries, the United States agreed to make an additional advance payment of $100,000.00. Century Indemnity supplemented its original bond by adding $100,000.00 to the penal sum, increasing it to $245,351.25. Thereupon, the Government made another advance payment to Spencer, after which the net total advanced amounted to $244,124.49.

Some six months after the second advance payment was made, and more than 16 months after the original contractual period for full delivery had expired, Spencer had delivered slightly more than half of the total requirement. In those circumstances, and at the request of the War Production Board, but without the knowledge or consent of the surety, the Government on July 14, 1943, wrote Spencer as follows:

"You are hereby directed to cancel the outstanding balances on the above orders. We will accept whatever material is now in process. However, every effort should be made to divert this material which you now have in production to other orders.

"Please acknowledge this cancellation to. Mr. Paul F. Schucker, Room 1354, Social Security Building, and advise him as to exactly how much

material you now have in process and the amount affected by this cancellation, item by item."

When this letter was written, Spencer had made and been paid for deliveries aggregating $291,206.78, and had also received advance payments of $244,124.-49. The then unexecuted portion of the contract—$290,198.22—exceeded the advance payments by the sum of $46,073.73. Consequently, if the contract had proceeded to completion, the Government could easily have recaptured its advances out of deliveries.

By letter dated July 27, 1943, Spencer acknowledged the letter of cancellation without protest, and advised that it then had 44,000 pounds of material in process which would be delivered upon completion. Two deliveries thereof were made, one on July 28, 1943, in the sum of $13,-787.03, and the other on August 18, 1943, in the sum of $10,937.33. It thus appears that the material Spencer had in process when the letter of cancellation was written amounted to only $24,724.36. Despite the fact that unliquidated advance payments to Spencer then amounted to $244,-124.49, the Government paid in cash for the two post-cancellation shipments: $13,787.03 on August 6, 1943, and $10,-937.33 on August 24. It also paid Spencer $10,143.51 on July 21, 1943, for a delivery made July 12. These three payments, made after cancellation, total $34,-867.87, which is the amount in controversy here.

On January 27, 1944, the Government made formal demand on Spencer for $250,504.29, which included the advance payments of $244,124.49, and certain items not in issue here. Spencer did not respond but went into bankruptcy. Whether the United States proved its claim does not appear; at any rate, it received nothing from the bankrupt estate. On or about February 21, 1944, the Government demanded of the surety the sum

of $244,124.49 [1] under the advance payment bond. Century acknowledged liability for $209,256.52 and paid that amount August 14, 1948. It denied liability, however, for the remainder of $34,867.87, the sum of the three post-cancellation payments to Spencer, on the theory that instead of making these payments the Government should have retained them to apply on the liquidation of the advance payments. This suit followed.

The parties agree that the sole issue on this appeal is whether the surety was released from liability to the extent of the three payments to Spencer made after the notice of cancellation had been given.

■ By the terms of the bond, the surety's liability thereunder was "conditioned upon the failure of the principal to make payment to the Government according to the provisions of the contract" between Spencer and the United States. The contract and the bond must therefore be read together to determine the rights and liability of the surety and the duty, if any, owed to it by the Government.

Spencer agreed in the contract that, on or before the original or extended completion date, it would "pay to the Government the full sum * * * advanced or such part thereof as shall not have been liquidated as hereinabove provided." Thus the repayment obligation of Spencer and Century is connected with and dependent upon the preceding provision of the contract which governed the liquidation of the advance payments. That provision is as follows:

> "All wire delivered to the Government under the contract shall, upon acceptance thereof by the Government, be paid for at the unit prices stated in the contract until the sum of the payments so made plus the amount of the advance payment shall equal the full contract price. All remaining deliveries of wire under the contract shall, upon acceptance

---

1. Apparently this figure should be $244,-124.39, since the amount paid, $209,256.-52, and the additional amount sued for, $34,867.87, total that sum. Disregarding the 10-cent error, we refer, as the parties do, to the advancements as being $244,-124.49.

thereof by the Government, be paid for by crediting the value of such wire, at the unit prices stated in the contract, against the contractor's obligation to repay the sum advanced, until such sum shall be completely liquidated."

The imperative "shall" in the last sentence of the passage just quoted from the contract required the Government, after delivery payments and advance payments together equalled the full contract price, to apply the value of subsequent deliveries to the liquidation of the advance payments. To do so was a duty owned by the Government to the surety.

The Government argues that when it made the three post-cancellation payments, the total of delivery payments and advance payments did not equal the full contract price; that therefore its duty to apply the value of subsequent deliveries to the liquidation of advance payments had not arisen. It says that consequently it was under a clear contractual obligation to make the three disputed payments since they were for wire delivered and accepted which "shall  *  * be paid for at the unit prices  *  *  * ."

This argument depends for validity upon its assumption that, before the three questioned sums were paid, the value of material delivered and paid for plus the advance payments had not equalled "the full contract price." Whether this assumption is itself valid depends upon the legal effect of the Government's letter of July 14, 1943. If the undelivered portion of the contract was thereby effectively terminated, the original total price of $581,405.00 was reduced to $291,206.78 (the deliveries then already made and paid for) plus the relatively trifling deliveries to be made from material then in process (which turned out to be only $24,-724.36). These two sums were far ex-

ceeded by the total money Spencer had already been paid. It follows that, if the letter of July 14 terminated Spencer's obligation to deliver the unexecuted portion of the original total price, it was the Government's duty to withhold the three payments and apply them to reduce the advancements. The Government, in its brief, recognizes that its duty to the surety required it to withhold the three subsequent payments and apply them to the reduction of the advancements "if there was, in legal contemplation, a valid cancellation of the ageement or a modification of the terms of payment by mutual consent of the parties to the contract." [2]

The Government seeks to avoid the effect of its situation by pointing out that it did not know, until advised by Spencer's letter of July 27, 1943, how much material was in process, and by saying,

" *  *  * Until this letter was received, and its contents evaluated, it is hardly reasonable to suppose or assume, as appellant does, that Government agents knew that the material in process was less than the full amount called for by the contract.  *  *  * "

The United States knew how much was in process when the last two of the three questioned payments were made on August 6 and 24, for the letter of July 27 had been received previously. Aside from that, however, the quoted statement is unrealistic. It would have been most unreasonable for the Government to suppose or assume that at the time of cancellation the dilatory Spencer, which in 16 months had only been able to make deliveries amounting to $291,206.78, might then have in process of manufacture goods amounting to $290,198.22, the unexecuted portion of the original total price. As we have said, the material in process finally amounted to $24,724.36. It is plain enough, we think, that the

2. The Government's brief says:
  " *  *  * We have shown above, however, that under the contract the contractor's advance payment obligation in effect matured only when the value of material delivered plus the advance payment equalled the full contract price. Since this contingency had not arisen at the time

the three payments were made, a right of the Government to withhold payment, to say nothing of a duty to the surety to do so, could arise only if there was, in legal contemplation, a valid cancellation of the agreement or a modification of the terms of payment by mutual consent of the parties to the contract."

Government could have had no hope of recapturing advances of $244,124.49 from deliveries of material in process when the cancelling letter was written.

That being true, decision turns on the effect of the letter of July 14. It is suggested that the Government inaptly used therein the words "cancel" and "cancellation," which connote bilateral action. Whether the letter technically constituted cancellation, rescission or modification is immaterial. There is no doubt about what the Government meant: it would accept no more deliveries except from material then in course of manufacture; it was terminating not only Spencer's obligation to finish the contract, but also its right to do so. We think the letter of July 14 had the legal effect of terminating the unfilled portion of the contract, save for the material in process. Spencer's long delay in accomplishing only partial performance, which was a breach of its contractual obligation, justified the Government's action.[3]

The appellee asserts that the failure of Government agents to take advantage of an available right of set-off,[4] whether through negligence, mistake or misapprehension of law, cannot prejudice the interests of the United States, nor does their failure redound to the surety's pecuniary benefit.

In making instead of retaining the three payments, the Government did more than merely fail to take advantage of a right of set-off. Regardless of that, however, we reject the argument. When, as here, the United States enters the market place in transactions which become justiciable matters, it is subject in its contractual obligations to the same principles which apply to individuals in commercial transactions. It is bound by its contract just as a private person is. Cooke v. United States, 1875, 91 U.S. 389, 23 L.Ed. 237; Hollerbach v. United States, 1914, 233 U.S. 165, 171, 34 S.Ct. 553, 58 L.Ed. 898; Reading Steel Casting Co. v. United States, 1925, 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907; United States v. National Exchange Bank, 1926, 270 U.S. 527, 534, 46 S.Ct. 388, 70 L.Ed. 717; Lynch v. United States, 1934, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434; S. R. A., Inc., v. Minnesota, 1946, 327 U.S. 558, 564, 66 S. Ct. 749, 90 L.Ed. 851. An individual situated as the Government is here clearly could not recover. It would be unconscionable to permit the Government to do so. The judgment appealed from will be set aside, and the case will be remanded for entry of judgment in favor of Century Indemnity.

Reversed and remanded.

3. " * * * [T]he rule in such cases is, that time is and will be of the essence of the contract, so long as the contract remains executory, and that the purchaser will not be bound to accept and pay for the goods, if they are not delivered or tendered on the day specified in the contract." Jones v. United States, 1877, 96 U.S. 24, 28, 24 L.Ed. 644.

4. The Government uses the word "set-off," which does not technically apply to opposing claims arising from the same contract.