**C. H. McQUAGGE, d/b/a Shreveport Contracting Company**

v.

**UNITED STATES of America**

v.

**GREAT AMERICAN INDEMNITY COMPANY, Third-Party-Defendant.**

**Civ. A. No. 7176.**

United States District Court
W. D. Louisiana,
Shreveport Division.

Sept. 13, 1961.

Kenneth G. Burgess, Shreveport, La., for plaintiff and Third Party Defendant.

T. Fitzhugh Wilson, U. S. Atty., and Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., for the United States.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

This case presents a disgusting example of bureaucratic incompetence, irresponsibility, negligence, and outright disdain for the Government's interests, in connection with a $55,000 construction contract at Barksdale Air Force Base. The intricate details will be developed in the course of this opinion.

Plaintiff, C. H. McQuagge, d/b/a Shreveport Contracting Company, brought this suit against the United States for recovery of the balance of the contract price due on Air Force Contract number AF 16 (602)–506. Jurisdiction is grounded on the Tucker Act, 28 U.S. C.A. Sec. 1346(a). In its answer the Government admitted liability under the contract for a balance due in the sum of $3,094.25, but counterclaimed for (1) $16,875 in damages for plaintiff's alleged breach of contract number AF 16 (602)– 402, awarded June 20, 1955, said to have resulted from his failure properly to meet the contract specifications with respect to flexural strength of the concrete used in the construction of certain taxiways at the Base; and (2) for $16,794.87 allegedly due to the United States for withholding and unemployment taxes which had accrued over a period beginning January 1, 1955, and ending December 31, 1956, as evidenced by eight tax liens recorded in the public records of Caddo Parish, Louisiana.

Plaintiff filed a motion for summary judgment and a motion to dismiss the government's counterclaim for failure to state a claim upon which relief can be granted. Thereafter the government filed an amended answer and counterclaim alleging that the contractor had dismissed his appeal from the Contracting Officer's decision before the Armed Services Board of Contract Appeals. The government seeks to have the $3,094.25 owed the contractor under contract number AF 16(602)–506 set off against plaintiff's alleged indebtedness of $16,875.00 under contract number AF 16(602)–402, leaving a balance owed the government of $13,780.75 under counterclaim number (1) above. Additionally, the government prays that Great American Indemnity Company, a third party defendant, be held liable to the United States in the principal sum of $13,780.75, *in solido* with the contractor, McQuagge, and, in addition, individually liable for $3,094.20, with interest, this latter sum representing the set-off against the amount owed the government by the contractor.

On March 13, 1961, the contractor and government entered into a joint stipulation in which McQuagge admitted owing the United States $14,353.50 for withholding and unemployment taxes, including interest through March 1, 1961, and a recordation fee of $1.50. He denied liability, however, as to the counterclaim asserted with respect to contract number AF 16(602)–402.

Great American Indemnity Company answered the government's counterclaim urging the same defenses asserted by McQuagge.

The motion for summary judgment and motion to dismiss for failure to state a claim upon which relief can be granted were referred to the merits. Trial on the merits commenced on March 6, 1961, and concluded on March 8, 1961. Having settled all other matters, we now come to the merits of the government's counterclaim on contract number AF16(602)–402 as against the contractor and his surety.

Contract AF 16(602)–402 was awarded to McQuagge on June 20, 1955, and approved on June 23, 1955. It called for replacement of previously failed concrete slabs in taxiways at Barksdale Air Force Base, Louisiana, for a total price of $55,-250. The project was undertaken and completed within the prescribed period and a certificate of final acceptance was signed by Philip Gumbiner, civilian Contracting Officer for the Base, on October 6, 1955. Final payment of the contract price was approved and made on October 13, 1955. However, nearly a year later, on October 2, 1956, Gumbiner wrote a rather vague letter to McQuagge advising that he had failed to comply with certain provisions of the contract and that the extent of non-compliance would be ascertained at a later date. The letter contained no details as to the nature of non-compliance and no particular demands were made upon McQuagge. On July 10, 1957, more than nine months later, Gumbiner again wrote McQuagge stating that the contract specifications relative to flexural strength of the concrete poured on the taxiways had not been complied with; that it was impossible to determine which of the slabs "failed" due to substandard material; hence the contractor would be required to replace *all* of the slabs which had failed. In other words, Gumbiner sought to hold McQuagge responsible for slabs which failed as a result of his alleged wrongdoing, as well as those due to other reasons such as design defects for which the Contracting Office was responsible. On March 10, 1958, Gumbiner again wrote McQuagge admitting that while responsible Air Force personnel had knowl-edge when final acceptance and payment were made, of the alleged failure of the concrete to measure up to specifications, still he was making demand, under Section 9 of the contract, that the entire project be condemned because of defective workmanship and materials. McQuagge was given thirty-days to appeal the decision of the Contracting Officer. The decision was appealed, preserving, however, all objections to the jurisdiction of both the Contracting Officer and the Secretary of the Air Force on the ground that the dispute arose out of a contract whereunder performance had been finally accepted and final payment made pursuant to the provisions of the contract. This suit was filed September 25, 1958. Immediately prior to trial on the merits, McQuagge dismissed his appeal before the Armed Services Board of Contract Appeals, and relies for relief upon the evidence adduced here.

Some of the facts are not disputed. The total area of all concrete replaced by McQuagge was 48,212.5 square feet, consisting of 257 concrete slabs or squares of $12\frac{1}{2}$ x 15 feet dimension. Of the total, only 75 showed noticeable defects, according to John H. Liebl, a civil engineer for the Air Force and a government witness. This leaves a balance of 182 slabs placed by McQuagge without defects. Frank J. Birdsong, a civilian Air Force concrete inspector, testified that approximately 45% of the total area showed either hairline cracks or cracks running throughout the depth of the slabs. Thus, according to Birdsong's testimony, 21,750 square feet of the 48,212.5 square feet replaced by McQuagge indicated some degree of failure. Birdsong, however, did not attribute all of the failures to faulty workmanship or materials supplied by McQuagge, and conceded that other causes, including design defects, could have brought them about.

The government's claim centers upon the alleged failure of McQuagge to satisfy the requirements of provision Tp 4–04 of the contract, which provides:

"Tp 4–04 Strength: The concrete mix will be designed by the contrac-

tor and submitted to the Contracting Officer for approval. The concrete mixture shall be designed to produce concrete having a minimum flexural strength of 700 pounds per square inch at the age of seven days determined by standard beam test performed in strict accordance with ASTM Standard C78–49. The seven-day flexural strength may be obtained by high early strength cement or by the use of sufficient quantity of portland cement. Prior to the start of paving operations the contractor shall cast, cure and test standard beams in strict accordance with ASTM Specification C78–49. The method of making and curing test beams shall be in accordance with C192–52T."

The government introduced thirty-six concrete beam flexural strength test charts, each initialed on the back by Major William B. Weaver, military Contracting Officer. The evidence that these tests were made upon concrete specimens supplied by McQuagge is most inconclusive; and so is the matter of whether the tests were conducted properly. Assuming, arguendo, that they were authentic, fourteen of these charts indicated the flexural strength of the several test samples at seven days to be 580, 558, 591, 582, 566, 396, 430, 475, 491, 497, 496, 539, 539 and 541 pounds per square inch or an average strength of 520 P.S.I. at seven days. The remaining twenty-two test charts indicated the flexural strength of the several concrete beams at fourteen days to be 525, 641, 566, 614, 589, 612, 537 and 554, and at seventeen days to be 606 and 675 and at twenty-eight days to be 705, 673, 587, 662, 718, 583, 625, 537, 596, 679, 616 and 650 per square inch. The average flexural strength of the sample beams at fourteen, seventeen and twenty-eight days approximates 615.90 pounds per square inch.

In any event, all thirty-six of these tests, argues the government, were conducted during construction of the taxiways and were completed and the results known prior to acceptance and final payment for the finished work.

Gumbiner, who has been Deputy Base Procurement Officer and civilian Contracting Officer at the Base since January, 1955, testified that he was familiar with the initials of Major Weaver and from his knowledge of the practice and procedure in the office of the Contracting Officer, the thirty-six charts were received in that office and the initials on the back of each chart were those of Major Weaver. Gumbiner also testified that although he was the civilian Contracting Officer, he had equal authority with Major Weaver as to ordinary contractual matters. Gumbiner further testified that it was standard procedure for either the contractor or someone in the engineering office to bring the test charts to the Contracting Officer's office for checking and approval.

Fred Z. Mills, Chief Engineer in the Engineering Division during performance under the contract, testified that the charts would normally come out of the laboratory used by the Army Corps of Engineers into the Contracting Officer's office, then to the engineering office, and then back to the Contracting Officer's office for approval or disapproval. Mills further testified, after considerable hedging, that he had personal knowledge of the failure of some of the test samples to measure up to specifications in the contract.

Birdsong testified that he was in the Base laboratory when all of the thirty-six tests were made and he reported the existence of hairline cracks and physical evidence that indicated substandard concrete mix to Mills. He further testified that Mills was "ninety percent" familiar with everything that transpired but refused to issue a stop order. Birdsong's testimony was as follows:

"The Witness: * * * There are so many things involved in this until it is hard to pin down. The general thing is, of course,—Mr. McQuagge knows I tried to get the Chief Engineer, Fred Mills, to stop

the job until we got it straightened out.

"The Court: Got the mix straightened out?

"The Witness: Got the mix straightened out, and then, we would have a pretty good job.

"The Court: As it was, McQuagge had to go on even though he was trying to get the proper mix and still proceed with the job?

"The Witness: If he would have a stop order, he could have stopped.

"The Court: But they didn't give it to him and he had to operate?

"The Witness: That's right.

"The Court: It looks like this thing was as much the fault on the part of Mills, or whoever was in charge?

"The Witness: This gentleman says I might have a lot of animosity against Mills because he threw away a lot of good Government money when he knew he wasn't doing right. He could have gotten McQuagge to stop and get another designed mix and put an inspector at the batch plant to be sure the weights were right. That is what I tried to have done. We couldn't get one in there.

"I got no backing whatever from Fred Mills. McQuagge did go and see him, and I would say, 'What did Mills have to say?' He said 'Not much of anything.' I would say, 'Did you tell him to stop?'

" 'No, he didn't tell me to stop.'

"I was so desperate, I asked Lt. Blackman three or four times to transfer me over to another inspection job. I didn't want anything more to do with that and put somebody in my place because I wouldn't go along with that."

Lieutenant Blackman, a civil engineer at the Base, was assigned to the project and, according to Birdsong, he encouraged falsification of the daily reports required of Birdsong. Testifying as to whether his daily reports reflected the existence of faulty concrete, Birdsong said:

"A. One occasion you have right there. I made up three, three days straight, and sent them in to Lt. Blackman and he carried them in to Mills, I presume.

"He brought them back to me and said, 'If I send them in there, they are dynamite.' He said, 'What do you want to do with them?' He said, 'Tear them up.'

"So, I tore them up.

"Q. What date was that? A. About the middle of the job.

"What good would it do me to write it up and he said 'Don't send them up because they are dynamite?'

"Q. These daily reports went in? A. Not all of them. A bunch of them were changed.

"Q. You change these? A. No. I didn't change those. Numbers didn't go in.

"Q. I am asking you now, sir, very seriously: Who instructed you to make a change in the daily reports? A. Lt. Blackman. He said they were too bad. They are dynamite. They will never do to send them in there.

"Q. So far as you are concerned and as far as this Court is concerned, we can place no reliance on these daily logs, can we? A. No, we really cannot. It wasn't what I thought about it. It was what Lt. Blackman got instructions from Fred Mills to do. I was begging all the time for a stop order.

"Q. In other words, according to your testimony, any contractor who deals with the United States of America is subject to the vicissitudes of people who will order people like you to change their logs to cover up their gross errors in design, their gross errors in testing and their over-all general negligence? A. If you are going to work out there, you would have to change it because if you wrote the truth about it, you

would be out of a job real quick, out there.

"I took my instructions from Lt. Blackman.

"I wish that guy was here."

Blackman was not produced by the government as a witness, either in person or by deposition.

From the foregoing testimony of government witnesses, it was clearly established that the military Contracting Officer *and* the Chief Engineer *and* the concrete inspector were fully aware all along that the tests and inspections indicated the concrete mix did not measure up to specifications.

Notwithstanding this information in his possession, the Contracting Officer at the Base certified a final acceptance of the work under the contract on October 6, 1955, and, as stated, final payment was made to the contractor on October 13, 1955. All of this was done with full knowledge that the concrete mix did not conform to specifications under the contract, according to the results of tests performed at the Base laboratory under the immediate supervision of Base personnel. The Contracting Officer, Major William B. Weaver, had authority under the contract to change specifications at any time. Section 3 of the General Provisions provides, in part:

" * * * The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof."

The Contracting Officer also had authority to settle disputes involving questions of fact arising under the contract. Article 6 of the General Provisions provides, in part:

" * * * Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor * * *."

The determination of whether articles, equipment, and supplies measured up to the quality called for in the contract was made by the Contracting Officer.

Article 8 of the General Provisions provides, in part:

"Unless otherwise specifically provided for in the specifications, all equipment, materials, and articles incorporated in the work covered by this contract are to be new and of the most suitable grade of their respective kinds for the purpose and all workmanship shall be first class. Where equipment, materials, or articles are referred to in the specifications as 'equal to' any particular standard, the Contracting Officer shall decide the question of equality. The Contractor shall furnish to the Contracting Officer for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and other pertinent information. When required by the specifications, or when called for by the Contracting Officer, the Contractor shall furnish the Contracting Officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval shall be at the risk of subsequent rejection. * * *"

The contract contains provisions for preliminary inspection and final acceptance of certain materials and finished articles to be incorporated into the work. Article 9 of the General Provisions provides, in part:

"(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the

quantity justifies it, unless otherwise stated in the specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site. Nothing contained in this paragraph (d) shall in any way restrict the Government's rights under any warranty or guarantee."

The sole provision in the contract relating to warranty or guarantee of the work or materials is Section 1–08 of the Special Provisions which, in pertinent part, provides:

"(c) All articles and supplies, and equipment parts and assemblies thereof, *of standard manufacture, or for which detail design or requirements are not prescribed in these specifications*, shall be guaranteed by the Contractor against any failure in the proper use or operation caused by defective material, workmanship, or design for a period of one (1) year from the date of final acceptance of the complete work under this contract. Failure in any part due to such causes within that time shall be promptly and satisfactorily remedied by the Contractor without cost to the Government." (Emphasis supplied.)

As pointed out by the government in its briefs, the foregoing provision does not comprehend the concrete mix for which detailed specifications were laid out in the contract.

At the completion of the contract, the Contracting Officer was authorized to examine the work, and upon finding the work to have been satisfactorily completed in accordance with the specifications, he was further authorized to make final acceptance of the entire work on behalf of the government, and to authorize final payment to be made to the contractor. Article 1–19 of the Special Provisions provides:

"SP 1–19 Final Examination and Acceptance Relating To Payment

"(a) Within Thirty (30) days after completion of all work under this contract, if possible, the work will be given a final examination. When all of the work is found to be satisfactorily completed in accordance with the specifications, the entire work will be finally accepted by the Contracting Officer for and in behalf of the Government and final payment will be made to the Contractor.

"(b) Final acceptance of the work and deductions or corrections of deductions made thereon will not be reopened after having once been made, except on evidence of collusion, fraud or obvious error in connection with such final acceptance or payment.

"(c) For purposes of this clause, final acceptance refers only to final acceptance which will allow the Contractor to be paid and does not refer to the final acceptance in relation to inspection of material, in connection with which the Government reserves certain rights as set forth in clause 9(d) of this contract."

Clause (c) above is inserted so as not to confuse the final acceptance of certain materials and supplies at the job site or at the plant during performance of the contract with the final and conclusive acceptance of the "entire work" which allows the contractor to be finally paid. The reservation of "certain rights" referred to in clause (c) above is a reference to the language in General Provision 9(d), supra, to the effect that "such inspection and written or other final acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract, damage or loss in transit, fraud, or such

gross mistakes as amount to fraud." The government, in General Provision 9(d), reserves the right to reject the materials and supplies for the foregoing reasons until such time that it elects to finally and conclusively accept the "entire work" under Article 1–19 of the Special Provisions. Under the latter provision the government reserves the right to reopen the final acceptance of the "entire work" only upon evidence of *collusion, fraud, or obvious error* in connection with such final acceptance or payment.

The government is correct in its assertion that the one-year guarantee contained in Article 1–08 of the Special Provisions of "[a] 11 articles and supplies, and equipment, parts and assemblies thereof, *of standard manufacture, or for which detail design or requirements are not prescribed in these specifications*," does not apply to the concrete mix supplied by the contractor. As the government argues, detailed specifications are included in the contract to insure the required flexural strength and the mix is not an article of standard manufacture because the formula for concrete with a flexural strength of 700 P.S.I. at seven days was specially designed for this project.

The Contracting Officer was vested with authority to alter the requirements of the contract and it was within his discretion to determine whether the contractor had satisfactorily performed his obligations under the contract. Here, the Contracting Officer had personal knowledge that the flexural strength tests indicated that the concrete had an average flexural strength at seven days of 520 P.S.I.

As stated, the tests were conducted at the Base laboratory under the supervision of Base personnel, including the Chief Engineer on the project. McQuagge was not requested or ordered to stop construction and there is no evidence that he attempted to conceal or falsify the results of the tests. The authorized, supposedly responsible Supervising Officers simply stood by and observed the tests without raising any objections thereto or issuing a stop order. The contract clearly states that the Contracting Officer may inspect samples of concrete or any other supplies and it is within that officer's discretion to reject any faulty or inferior goods. (Special Provisions TP 4–05; General Provisions, Art. 8.) Tests were made and the results were apparently satisfactory to the Contracting Officer or otherwise he would not, after initialing each of the thirty-six test charts, have signed the certificate of final acceptance and authorized final payment to the contractor.

Another provision in the contract which contemplates the stage at which the contractor's responsibility ceases is Article 11 of the General Provisions which provides, in part:

"11. Permits And Responsibility For Work, Etc.

"The Contractor shall, without additional expense to the Government, obtain all licenses and permits required for the prosecution of the work. He shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work. *He shall also be responsible for all materials delivered and work performed until completion and final acceptance, except for any completed unit thereof which theretofore may have been finally accepted.*" (Emphasis added.)

Article 7 of the General Provisions also contemplates a time limit as to the contractor's responsibility. In providing a method for partial payments to the contractor, the contract provides

"(b) In making such partial payments there shall be retained 10 percent of the estimated amount *until final completion and acceptance of all work covered by the contract: Provided, however,* That the Contracting Officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial pay-

ment in full: *And provided further,* That on completion and acceptance of each separate building, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentage thereon, less authorized deductions." (Emphasis partially supplied.)

█ Special Provision SP 1–19 of the contract, as heretofore explained, does not conflict with other General Provisions of the contract. However, should there be a possible conflict, the Special Provision, being the last written and specially inserted into this contract to supplement the General Provisions found in all such contracts, must control.

· Final acceptance can mean only one thing within the context of this agreement: conclusive and decisive action by the government upon which it determines through its authorized agents that, on the basis of all the facts within its knowledge, the contractor has satisfactorily performed his obligations under the contract. We are not dealing here with latent defects, fraud or misrepresentations; on the contrary, during performance of this contract all of the facts were in the open for all parties concerned to observe and consider in reaching their conclusions as to whether or not the other party satisfactorily performed under the contract. The only possible exception to this is, of course, the conduct of Lieutenant Blackman, as related by Birdsong, whereunder the government's agents or officers encouraged falsification of interagency records. This dereliction of duty certainly is not attributable to the contractor, who, here obviously was forced into working with persons characterized by gross irresponsibility and malfeasance of their authority.

█ In a case such as this, the government can only act through those to whom it has delegated authority to make decisions. It was within the discretion of the Contracting Officers to determine whether the work was acceptable to the government, and final acceptance by such officers was subject to being opened or questioned only upon evidence of collusion, fraud, or obvious error. This is spelled out in the government's contract.

The government has not alleged, nor has it offered, any evidence of collusion or fraud on the part of McQuagge. It cannot be said that there was any obvious error in connection with the final acceptance because the Contracting Officer was fully apprised of all the facts and had personal knowledge of what the flexural strength tests indicated.

The truth of the matter seems to be that the real fault here rests with the government in not designing the replaced slabs to a thickness adequate to satisfy the requirements of present and projected Air Force operations. Fred Mills, Chief Engineer at the Base, testified that the replaced slabs were designed to accommodate B–29 type aircraft. The Air Force was at the time, however, employing B–47 type aircraft for which a different, and much thicker and heavier design was required. John H. Liebl, Engineer and government witness, testified that the B–47 is fifty per cent heavier and much harder on the concrete than the B–29. Liebl also testified as follows:

"Q. Wouldn't you, as an engineer, seeing the failure in one point and your replacing it exactly, or approximately, exactly to what was there, wouldn't you expect it to fail? A. In time, yes, I would. I would expect it to fail more quickly than if I had designed it right.

"Q. Do you know how many times they used those taxiways? A. No, sir, I couldn't testify to that.

"Q. Knowing you are going to use these for B–47's, how long would you have kept those taxiways free from traffic after the concrete was poured? A. If I remember these specifications, they call for 700 p. s. i. in seven days, which would have permitted aircraft traffic on the pavement. However, when they didn't get that strength, then they should

have gotten airplanes off it until it reached it.

"Q. I think the record will show aircraft traffic was commenced on there shortly after September 28, and the concrete was poured sometime in September.

"Do you consider that sufficient time? A. If the concrete met 700 p. s. i. within seven days. I would consider it sufficient time if you got your strength.

"The Court: If you don't?

"The Witness: No. In this case, apparently, they hadn't had their strength, so they shouldn't have."

Between September, 1955, and September, 1958, the date on which this suit was filed, the government must have realized at last that the specifications in the McQuagge contract were not suitable for present Air Force operations. This is shown, in response to a question as to why the government changed its demand for replacement of the concrete to a demand for money damages, where Gumbiner testified:

"A. * * * The Civil Engineers advised me that the replacement in kind was not appropriate.

"The Court: Why?

"The Witness: I think, to my recollection, that the *airplane weight load,* or some kind of business like that, did not make these light weight slabs necessary any more and *we should try to get money instead of concrete.*" (Emphasis added.)

■ In ordinary contractual relations with its citizens, the government enjoys the same privileges and assumes the same liabilities as does its citizens. This is distinguished from the situation where the sovereign is seeking to enforce a public right or protect a public interest, for example, eminent domain or an exercise of the taxing power. In the latter case the government is not bound by ordinary rules of private contract law or by doctrines of estoppel or waiver. When the government enters the market place, however, and puts itself in the position of one of its citizens seeking to enforce a contractual right (i. e., one which arises from express consent rather than sovereignty), it submits to the same rules which govern legal relations among its subjects. United States v. Oklahoma Gas & Electric, 8 Cir., 1924, 297 F. 575, United States v. The Thekla, 1924, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313, Carstens Packing Co. v. United States, D.C.W.D.Wash.S.D.1945, 62 F. Supp. 524, Kemp v. United States, D.C. Md.1941, 38 F.Supp. 568, Century Indemnity Co. v. United States, 1956, 99 U.S. App.D.C. 19, 236 F.2d 752.

■ In the case at bar, the government wrote the contract upon which it is suing and if there is any ambiguity or doubt as to the meaning or effect of its provisions, that doubt must be resolved in favor of the contractor and against the government. Wunderlich Contracting Co. v. United States, Ct.Cl.1958, 166 F.Supp. 741, United States v. Bentley & Sons Co., D.C.S.D.Ohio E.D.1923, 293 F. 229.

■ Moreover, it follows from what has been said that upon entering into ordinary private, contractual relations, the government subjects itself to the universal rule of moral conduct requiring an aggrieved party to do all that is reasonably within his power to mitigate damages which are likely to result from the wrongdoing of another party. In this case the government did not attempt to mitigate the damages, if any, and, on the contrary, its officers and agents, acting within the scope of their authority, stood idly by and permitted the alleged faulty performance of the contract.

As stated in Kemp v. United States, supra [38 F.Supp. 571]. "* * * [t]he Court cannot refrain from the observation that it is just this sort of arbitrary attitude by Governmental departments and their officials that is calculated to destroy confidence on the part of our citizens and taxpayers in the conduct of our Government. It is calculated to undermine proper respect for the Govern-

ment, while encouragement of such respect, in accordance with the proper principles of law, is one of the prime duties of the Federal Courts."

■■ Having independently studied the government's argument that, notwithstanding contrary provisions in the contract, final acceptance and payment does not preclude recovery for known defects existing at the time of acceptance, due to the fact that the allegedly aggrieved party is the government rather than a private citizen, this Court is satisfied that such is not the law. Where a contract has been performed and a stipulated consideration has been paid, the general presumption is that the transaction is closed, and this presumption operates against the government as well as against private individuals. See Dubois Construction Corp. v. United States, 1951, 98 F.Supp. 590, 120 Ct.Cl. 139, and Poole Engineering & Machine Co. v. United States, 57 Ct.Cl. 232, 234.

Although the contract here contains language prescribing the legal consequences of final acceptance and payment, that effect being that it will not be reopened except upon evidence of fraud, collusion or obvious error, it is significant that ordinary rules of contract law, as applied to the facts here, are fatal to the government's argument. As stated by the Oregon Supreme Court in City of Seaside v. Randles, 1919, 92 Or. 650, 180 P. 319, 324,

> " * * * 'Where work is accepted [under a construction contract] with knowledge that it has not been done according to the contract, or under such circumstances that knowledge of its imperfect performance may be imputed, the acceptance will generally be deemed a waiver of the defective performance. But this rule does not apply to latent defects. The acceptance of work which has been defectively done, the defects being unknown and not discoverable by inspection, does not amount to a waiver of the imperfect performance.' "

The Louisiana rule is stated in Welsh v. Hume, La.App.1956, 86 So.2d 236. A waiver of obvious, patent defects existing at the time of final acceptance has been held applicable to public authorities. Spokane County v. Pacific Bridge Co., 1923, 106 Or. 550, 213 P. 151. Southern Surety Co. v. Sealy Independent School Dist., Tex.App.1928, 10 S.W.2d 786, and City of Seaside v. Randles, supra.

Moreover, the negligence, mistake or misapprehension of law on the part of a government officer or official has been charged against the United States government. In meeting the argument to the contrary, the Court of Appeals for the District of Columbia in Century Indemnity Co. v. United States, supra [99 U.S.App.D.C. 19, 236 F.2d 756], said:

> " * * * When, as here, the United States enters the market place in transactions which become justiciable matters, it is subject in its contractual obligations to the same principles which apply to individuals in commercial transactions. It is bound by its contract just as a private person is. [Citations omitted.] * * * "

See, also, Elrod Slug Casting Machine Co. v. O'Malley, D.C.D.Neb.1944, 57 F.Supp. 915, 920 (discussing estoppel or waiver against the government). In David J. Joseph Co. v. United States, 1949, 82 F.Supp. 345, 113 Ct.Cl. 3, the United States was held estopped to allege a breach of contract because of failure to object to alleged faulty performance.

■ The rule respecting final acceptance with knowledge of defects in construction is the same in Federal Courts as in City of Seaside v. Randles, supra; see George A. Fuller v. B. P. Young, 3 Cir., 1903, 126 F. 343. Moreover, the government may alter the original terms of a contract by subsequent action or conduct importing acceptance of irregular performance. White v. United States, 1916, 241 U.S. 149, 36 S.Ct. 532, 60 L.Ed. 929. See also, generally, 12 Am.Juris. § 355, 17 C.J.S. Contracts § 490, et seq.

In an annotation at 1 A.L.R.2d page 341, it is stated:

> "Whether the defense of estoppel may be asserted against the United States in actions instituted by it depends upon whether such actions arise out of transactions entered into in its proprietary capacity or contract relationships, or whether the actions arise out of the exercise of its powers of government. The defense of estoppel may be (though sparingly) availed of against the United States in transactions involving its proprietary functions, providing the functions of the government are not impaired thereby. * * * "

The government's argument that waiver and estoppel cannot be invoked against the sovereign must be qualified in light of the foregoing authorities. For a discussion of waiver of known defects under construction contracts, see 66 A. L.R.2d 570, et seq., and acquiescence in faulty performance as discussed in Uccello v. Golden Foods, 325 Mass. 319, 90 N.E.2d 530, 535, 16 A.L.R.2d 459, where the Court said:

> " * * * 'It is a familiar principle of equity jurisprudence that long-continued acquiescence in a course of conduct by one interested in it, especially when the rights of others are affected thereby, will induce the court to refuse him relief upon his subsequent complaint of it.'
>
> * * * 'It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word, silence or conduct of the plaintiff that there was no objection to his operations.' * * * "

Here, as shown, acting through its authorized officers and agents, the government acquiesced in the performance of the contract by McQuagge without questioning the alleged failure of the concrete to measure up to specifications according to, significantly, the government's own tests, the authenticity of which is open to serious doubt.

For the reasons given, and inasmuch as the liability of the government to McQuagge on Air Force contract number AF 16 (602)–506 is admitted, in the sum of $3,094.25, and the liability of McQuagge to the United States for withholding and unemployment taxes is admitted, in the sum of $14,353.50 through March 1, 1961, judgment will be rendered in favor of the United States for $11,-259.25, and the government's counterclaim number (1), as well as its claim against Great American Indemnity Co., will be denied and rejected.

A proper decree should be presented on notice.

Thus Done And Signed, in Chambers, in Shreveport, Louisiana, on this the 13th day of September, 1961.